1

1   UNITED STATES BANKRUPTCY COURT
    SOUTHERN DISTRICT OF FLORIDA
2
    CASE NO.:  13-21968-EPK
3

4   In Re:

5   THOMAS RALPH FARESE,

6
        Debtor.
7   _____/

8

9

10  2004 EXAMINATION OF:        THOMAS R. FARESE

11  TAKEN AT INSTANCE OF:       The Trustee

12  DATE:                       July 30, 2013

13  TIME:                       1:37 p.m. – 5:25 p.m.

14  PLACE:                      250 South Australian Avenue
                                Suite 700
15                              West Palm Beach, Florida

16

17

18

19

20

21

22

23

24              SUN COAST REPORTERS
                P. O. Box 221164
25          West Palm Beach, Florida 33422
                (561)640-9621

1   APPEARANCES:

2   On behalf of the Trustee:

3   MICHAEL BAKST, ESQUIRE
    Greenspoon Marder
4   250 Australian Avenue, Suite 700
    West Palm Beach, Florida  33401
5
    On behalf of the Debtor:
6
    MATTHEW GIRARDI, ESQUIRE
7   Ozment Merrill
    2001 Palm Beach Lakes Boulevard, Suite 410
8   West Palm Beach, Florida 33409

9   On behalf of Aaron and Delano:

10  BRUCE A. GOODMAN, ESQUIRE
    Moore & Goodman
11  2900 E. Oakland Park Boulevard
    3rd Floor
12  Fort Lauderdale, Florida 33306

13  Also Present:

14  Fred Aaron
    Darlene Delano
15

16

17

18

19

20

21

22

23

24

25

1                              <u>INDEX</u>
    EXAMINATION
2
    Witness Name                                        Page
3   THOMAS R. FARESE
         Direct By Mr. Bakst ................................. 4
4
    EXHIBITS
5
    Exhibit                                             Page
6   Trustee's Number 1 Marked for Identification        35
    Trustee's Number 2 Marked for Identification        35
7   Trustee's Number 3 Marked for Identification        45
    Trustee's Number 4 Marked for Identification        49
8   Trustee's Number 5 Marked for Identification        49
    Trustee's Number 6 Marked for Identification        57
9   Trustee's Number 7 Marked for Identification        71
    Trustee's Number 8 Marked for Identification        71
10  Trustee's Number 9 Marked for Identification        72
    Trustee's Number 10 Marked for Identification       72
11  Trustee's Number 11 Marked for Identification       73
    Trustee's Number 12 Marked for Identification       80
12  Trustee's Number 13 Marked for Identification       106
    Trustee's Number 14 Marked for Identification       109
13  Trustee's Number 15 Marked for Identification       123
    Trustee's Number 16 Marked for Identification       153
14  Trustee's Number 17 Marked for Identification       154

15

16

17

18

19

20

21

22

23

24

25

4

 1             The deposition of THOMAS R. FARESE taken at

 2    the instance of The Trustee, on oral examination,

 3    pursuant to notice, commenced at 1:37 p.m., on

 4    July 30, 2013, at 250 South Australian Avenue,

 5    West Palm Beach, Florida before Janice L. Mamino, Notary

 6    Public in and for the State of Florida at Large.

 7                           - - -

 8    WHEREUPON,

 9                      THOMAS R. FARESE

10    after being first duly sworn, was examined and testified

11    as follows:

12                  DIRECT EXAMINATION

13    BY MR. BAKST:

14        Q     Would you state your name and your current

15    address for the record?

16        A     Thomas Farese, 65 Northeast 4th Avenue, Unit

17    G, Delray Beach.

18        Q     What is the zip code there, if you know,

19    sir?

20        A     33483.

21        Q     Mr. Farese, my name is Michael Bakst.  We met

22    yesterday before the deposition of Mr. Roderman.  I'm the

23    attorney representing Margaret Smith, the trustee in the

24    Chapter 7 bankruptcy that you have filed.

25             We are here today pursuant to Rule 2004 of

1    the Bankruptcy Code so that I can ask you questions about

2    your bankruptcy.  I'm going to go through various

3    documents with you.  I'm going to go through your

4    schedules, your statement of financial affairs and ask

5    you general questions.

6             I know that you have experience with

7    depositions.  I'm just going to explain to you that a

8    Rule 2004 examination is like any other deposition.  It

9    is under oath and it is under penalty of perjury.  If you

10   do not understand a question today, please tell me you do

11   not understand.  I'll then try to explain it so that you

12   do.

13            If you don't know the answer to a question,

14   there is nothing wrong with saying I do not know.

15   Otherwise whatever answer you give is the answer I'll

16   presume is the correct answer.

17            Please try to wait until I'm done speaking

18   before you respond.  I'll try and do the same with you.

19   That's because the court reporter can only take down one

20   person speaking at a time.

21            Also if an answer calls for yes or no, try to

22   respond verbally with yes or no.  If you say uh-huh or

23   nod your head, it's very difficult to accurately take

24   that down.

25            Do you understand everything so far?

```
 1          A       I do.

 2          Q       Mr. Farese, have you ever filed bankruptcy

 3    before?

 4          A       No.  But let me just say one thing,

 5    Mr. Bakst.

 6          Q       Okay.

 7          A       I sent an e-mail -- and this is entirely your

 8    decision.  I don't think it should be my decision.  I

 9    sent an e-mail to Matt's office telling him that at 11:30

10    this morning there was a surge, a Florida Power & Light

11    surge, and that I don't have all of the documents that

12    you asked for with me.  So I did bring most of the

13    things, but there are other documents that I was -- got

14    from e-mails from different people because I don't have

15    possession of all this stuff.  And so I wanted them to

16    know to apprise you of that fact.

17               I'm perfectly willing to go ahead today, and

18    if you set another date in a day or two or three days,

19    I'll bring you the rest of the stuff or we can reconvene.

20    Whatever you would like to do.

21          Q       Why don't we get as far as we can today

22    because I suspect -- I know you filed a motion for

23    protective order.

24          A       That's only as to Goodman.

25          Q       I understand that.
```

```
1        A      That has nothing to do with you.  Whatever
2   you are looking for, I'll give you.  Only as to
3   Mr. Goodman because I feel as though he has already
4   deposed me, my wife and everybody else he has already
5   had.
6        Q      I will tell you --
7        A      I just wanted to put it on the record, the
8   reason why.  I want the trustee to know so that they know
9   that I'm not hiding anything or trying to hide anything
10  from Mr. Goodman.  I just feel as though enough is
11  enough.  He deposed everybody under the sun.  What else
12  do you want?
13       Q      The only reason I raised that is because in
14  the event the Court denies that motion, there is going to
15  be another deposition anyway.
16       A      Absolutely.  I'm aware of that.  I know that.
17  So are you suggesting that I should allow him -- withdraw
18  my motion?  Is that what you are saying?
19       Q      I can't suggest to you how you proceed.  I'm
20  just telling you that --
21       A      I would rather let it be heard by the Court.
22       Q      I understand.
23            MR. GIRARDI:  Matt Girardi for the debtor.  I
24       think he's saying in the event he needs additional
25       documentation, there may very well be another date
```

1     set anyway.

2              THE WITNESS:   That's fine.

3   BY MR. BAKST:

4         Q     Do you have the list of documents in front of

5   you?

6         A     I do.

7         Q     Why don't we start and let's determine what

8   exactly we have today, what we are still waiting for.  I

9   think that will give us a better idea also of how far we

10  can get today as well.

11        A     Okay.

12        Q     Let's start, why don't we go to -- do you

13  have it in front of you?

14        A     I do.  I have your notice.

15        Q     Number one is tax returns, and let me tell

16  you what I have.

17        A     I have those.

18        Q     One purpose today is also to make sure that

19  whatever documents I have are the same documents that you

20  think I have so that everybody is clear on what has been

21  produced and not produced.

22        A     If you got them from Mr. Merrill, they have

23  to be the same ones that I have got.

24        Q     I have 2012 and 2011.  What I have, let me

25  tell you, for 2012 appears to be three pages long.  If

1    you brought them with you, why don't we determine if

2    perhaps you may have copies with certain addendums,

3    attachments, amendments or schedules that I don't.

4         A      Here is mine.

5         Q      Thank you.  You have handed me a folder.

6    There is a --

7         A      Excuse me.  You make copies for me of

8    everything I'm giving you; right?

9         Q      Sure.  I don't want to keep any originals of

10   yours, Mr. Farese.  That is my intention as far as we

11   will copy.  If there is something that you have today

12   that is a copy that you can leave, let me know.  Is there

13   anything like that?

14        A      I'll leave everything with you.

15        Q      What I am saying is there anything that you

16   don't need back that you are giving me today?

17        A      I have to look as I go along.  I don't think

18   there are any originals here.

19        Q      The reason I tell people that is because when

20   we are done with the case, usually we destroy whatever

21   financial records we have.  So I try to always tell

22   people don't give me any of your originals or let me know

23   so we can copy them and give them back to you.

24        A      I should tell you that as far as the

25   documents are concerned, there are other documents that I

1    think are at least related to this Congress Plaza thing,

2    and I know that's the whole reason that we are here that

3    were filed in the bankruptcy court.  They are not

4    available.  I tried to get them off PACER.  I'm going to

5    the archives to get them.  There are a lot of agreements,

6    assignments, different types of things like that, that I

7    need to produce as evidence.

8          The same thing goes for the RICO case that

9    you heard Mr. Roderman testify about yesterday.  I need

10   to get those documents out of the archives, only the

11   exhibits.

12   Q     Back up.  You said something about in the

13   bankruptcy court, that there are certain things filed

14   with the bankruptcy court?

15   A     Yes.  When Harald was in bankruptcy,

16   Mr. Dude, there is -- I mean I appeared in seven or eight

17   different of his bankruptcies.  And we had to file

18   documents.  Most of it took place with assignments.  I'm

19   not looking to get all of the -- clog everything up with

20   a zillion documents, but I do want all of the

21   assignments.

22          I heard Mr. Goodman say yesterday that he had

23   one of them, but there are several assignments.  And I

24   want to get them all in the record because I want to make

25   sure that when you make your decision -- I'm assuming

1    that you are here not just for Mr. Goodman, you are here

2    for myself, the creditors, the estate, for everybody.  So

3    I want to make sure that you have got all of the

4    information there is to make a decision.

5         Q      Do you know if what other documents you filed

6    with the bankruptcy court were filed after 2005?

7         A      Before.

8         Q      The reason I say that --

9         A      2001.  I did it when I was away.  2001.  We

10   couldn't file -- pro se you can't file electronically.

11              MR. GIRARDI:  Go through the items, see

12         what you have and see what you don't.  If there

13         are other issues, we will address it as it comes

14         up.

15   BY MR. BAKST:

16        Q      In this folder I have, I'll go through and

17   try to identify.  It looks like a cover sheet for 2012

18   tax return, a letter from the accountant Paul Caccomo,

19   C-a-c-c-o-m-o, with United Tax and Financial Services,

20   LLC.  The first page is just his fee so it's an invoice.

21   There is an e-filed signature authorization appears to be

22   generally a summary I think of what is on the 2012 return

23   that you have.  Then I have the 2010 return.  I have 2012

24   towards the back.  Let me take a minute and go through

25   this.  In this package, there is a 2010 return showed

1    income of appears to be social security money.

2              MR. GOODMAN:  May I look over your

3         shoulder?

4              MR. BAKST:  Sure.  I'll let you review it

5         once I go through it.

6              THE WITNESS:  I would object to giving him

7         anything until -- I think he has seen these anyway,

8         but I would object to giving him anything until the

9         judge rules.

10             MR. BAKST:  Okay.

11   BY MR. BAKST:

12        Q    You also understand that there is

13   specifically as to tax returns a specific provision of

14   the Bankruptcy Code that allows him to request the

15   returns as well so --

16        A    When the judge rules, I'll give it to him.

17   And I think he has already seen them.  It's just that I

18   think he is only here to harass me and to harass my

19   family and for no other reason.

20             MR. GOODMAN:  For the record, that is not

21        correct.  I'm here today representing creditors

22        Aaron and Delano in a good faith effort to

23        represent them and their claims.

24             And I'll leave it at that.  We will leave the

25        rest for the judge.

1          THE WITNESS:  I have to add a claim that was

2      obtained underhandedly without me there and without

3      Mr. Ioni (phonetic) there and after Mr. Ioni

4      already paid with his condominium.

5          MR. GIRARDI:  Mr. Farese, I suggest that

6      further conversation regarding his clients, his

7      claim, right to depose you be held off until the

8      court date set for next Thursday.  There will be

9      plenty of opportunity to state both sides of the

10      argument.

11  BY MR. BAKST:

12      Q    Ultimately I'll make a copy of what is in

13  here, make sure that -- is your name pronounced Farese?

14      A    Yes.

15      Q    I want to make sure at least I do that right.

16  I'm looking at '09, a tax return in this folder.  At that

17  point, there was residential rental income of property in

18  Delray.  My recollection I didn't see that on the later

19  tax returns.  It looks like it's -- well, it's the same

20  property address you gave me where you are living?

21      A    It is.

22      Q    It indicates there was seventy-two thousand

23  dollars of rent in 2009 for that property?

24      A    Correct.

25      Q    How long did you rent out that property?

1    A    It was a two-year lease so we rented it for

2   two years, and we moved up the street for I think we paid

3   two thousand a month and we collected six thousand a

4   month.

5    Q    Why was the property rented out at that

6   time?

7    A    We couldn't afford to pay it back in that

8   year.  That was 2008 and 2009.  I think it was 2008.

9   We couldn't afford to pay it.  The club was doing

10  terrible.

11         And when we opened the club in '07, it was

12  actually the club went into debt for about five or six

13  hundred thousand.  It just couldn't make it.

14         So we -- the realtor knocked on the door and

15  said he had a client that wanted to rent, and we jumped

16  at it.  And then I went up -- we went to Canary Walk for

17  the two years while the renter rented our place.  I

18  didn't bring the lease that we signed at Canary Walk.  I

19  can get you that.

20   Q    Is Canary Walk is that where you --

21   A    It's not too far.  That's where we went when

22  we leased out our property.

23   Q    You were out of there by '09?

24   A    I can't give you the exact dates, but I would

25  say so.  No.  I don't think we moved back in there

1   until -- it was a two-year period.  I can't tell you the

2   exact dates.  I can when I come back, but I can't off the

3   top of my head.

4        Q    One thing that I'm looking for is any type of

5   K-1 or tax form from Congress Plaza or from Palm Steak

6   House.

7        A    I got permission from -- of course, Congress

8   Plaza I was involved with from 205 to 209.  I know that I

9   was obligated to bring that anyway.  But I did get

10  permission from my wife and from David Goldstein to bring

11  you things that are related to Congress Plaza, bank

12  statements and all that.  I'm not sure if the tax returns

13  are in here or not.  Do you want these now?

14       Q    No.  I'm going to try to go in order.  What I

15  was trying to determine is if you did have an involvement

16  in '09, at least from my initial review of this tax

17  return, I don't see a reference to any loss or income

18  from that business in your '09 return.

19       A    No, there wasn't any.  There was no income or

20  loss.  Actually, I was involved in Congress Plaza which

21  originally was in 2005 Riviera Yacht.  But it's never had

22  a tax ID number or value or owned anything or anything

23  else all of those years until we used it as a vehicle to

24  enter into a settlement.  We were trying to make

25  settlement all of those years.  So I had the company on

1    the side, and I used it.

2        Q     The settlement was reached in what year?   Was

3    that 2010?

4        A     You know, I brought some documents with me to

5    show you.   There was a settlement we first reached in

6    2007 all signed and sealed.   That went out the window.

7    Litigation started again right after that.

8            There was a second settlement.   The

9    settlement that he got serious about was in February of

10   2009, and that's when -- what I signed.   That never went

11   through.   That never went anywhere.   But that's when the

12   gears started going to get the property.

13           Actually, it was exercising my right to buy

14   the property under the sixty-year lease.   And when you

15   get to that, it's easy for me to show you.   But that deal

16   fell through.

17           We met again in May.   I think it was like

18   May, maybe the end of April, May.   That's when he got

19   involved with -- when I say he, I mean Harald Dude.   He

20   got involved with Jeff George.   He made some kind of

21   deal with George to make him his partner.   He actually

22   sold Congress Shopping Center to George while he was

23   dealing with me to make a settlement on all of the

24   litigation.

25           George ended up suing us on behalf of

1    Congress Shopping Center.  So that litigation started.

2    The foreclosure action that you saw yesterday was

3    actually a maneuver that Harald and his attorney and our

4    attorneys and myself said let's try this.  We tried to

5    foreclose on that note where -- actually, Harald signed

6    the note over to Congress Plaza.  I guaranteed the note.

7    Okay.  That's why you see my name on everything.  And I

8    brought the note with me so you can see it.

9         Q    When did Congress Plaza first obtain a tax ID

10   number?

11        A    I don't think they did until about maybe, I'm

12   going to guess in -- when they first started collecting

13   rent.  It had to be after July of 2010.  It had to be

14   because we settled -- as a matter of fact, I think I

15   brought the final settlement document with me in state

16   court that Judge Cox signed.  That's when we started

17   collecting rent.

18             So either that month or within a month or two

19   after that, we had to get a tax ID number because we had

20   to get the sales tax number and all that.

21        Q    What I'll do is we have this binder with your

22   tax returns.  We will get a copy of that.  I know the

23   trustee is going to want that.  Let me go through number

24   two with you.  Actually, two and three are related.

25   Basically, it's any banking accounts in which you have

1    had either a legal or equitable interest and between the

2    two of them they go through various types of banking

3    accounts.

4         A    All I had was checking.  Those are my checks.

5    I think that goes back almost three years.  There was

6    another account before that, Bank Atlantic.  There was

7    PNC Bank for about two months that I didn't get yet.  And

8    there was Bank Atlantic I'm having a problem getting.

9         Q    You are waiting for PNC banking records?

10        A    I had an account there for about two months.

11   As a matter of fact, PNC had an account for the club as

12   well until their hierarchy found out.  It's very

13   difficult to get banks to do strip club accounts.  So

14   they -- that's why we ended up with TD Bank.

15        Q    The PNC bank records would be for what period

16   of time?

17        A    Just before this.  I guess around 2011 or the

18   end of 2010.  I'm not sure exactly.  But these are all my

19   TD bank accounts here.

20        Q    PNC approximately how many months was it?

21        A    It was two or three months before it was

22   closed.

23        Q    It's either 2010 or --

24        A    And then for a year maybe a Bank Atlantic.

25   That's when I first came home.  I think I opened Bank

1    Atlantic.  But they were bought out by Bank America.

2    And I have been having problems getting records from them

3    because they claim they don't have it in their archives

4    anymore.  Which I have those letters that I wanted to

5    bring to show you.  That goes back to 205 or 6.

6         Q     The bank records that you are waiting to get

7    are PNC for a few months?

8         A     Right.

9         Q     From either 2010 or 2011?

10        A     Right.

11        Q     And then Bank Atlantic are you waiting for

12   those, have you sought those?

13        A     I have sought those, and I have letters

14   from Bank America saying they don't have them in their

15   archives, but I think they do.  If somebody besides an

16   individual -- so in other words, if I had David or

17   Barry write for them, you know from a lawyer, they might

18   say, well, let's get it for them.  But I haven't been

19   able to.

20        Q     What period of time did you have a bank

21   account at Bank Atlantic?

22        A     Since I first came home, about a year after I

23   came home.

24        Q     When was that approximately?

25        A     2006, 207 for a couple of years, and then we

```
1   went to PNC.  PNC closed all of the accounts that had to
2   do with the club and anybody affiliated with the club,
3   and then we went to TD Bank.
4        Q    What I have here --
5        A    All of the TD Bank stuff.
6        Q    Do you know if these are in any order?
7        A    I don't, no.
8        Q    The first page I'm looking at is a statement
9   from December 6, 2012 to January 5th, 2013, an account
10  under your name with the Delray Beach property.  Does the
11  bank send you either your cancelled checks or microfiche
12  copies of your checks?
13       A    I don't think I -- I'm not sure if I ever
14  used a checkbook with this, maybe one or two checks.
15  What I normally do is because there is so little activity
16  at the end of the year when I have to file the taxes, I
17  go online and I download everything.  Actually, these I
18  had Suzanne print off this morning for me.  She helped me
19  put some of the stuff together for me.
20       Q    Are you able to download copies of any
21  checks?
22       A    I am.  For the past eighteen months, I think
23  I can download.  Not the deposit slips with a personal
24  account, but I think I can get the checks, yes.  If I
25  can't, I know I can order them.
```

1       Q      I'm looking through here, and I'm trying to

2   get an idea of the money that goes in here.  I do see

3   social security goes into this account.  Is there any

4   other money that goes in this account?

5       A      Not in the last two years, no.  Does it say

6   two years?  Four years.

7       Q      This goes back four.

8       A      Yeah, four years.  No.

9       Q      It looks like some are 2013, some that are

10  2012.

11      A      Back in 2010, I may have taken some

12  consulting fees.  I was given consulting fees either from

13  the club or from Congress Plaza.  I don't know which.

14  But you will see them in there if they are in there.  I

15  forget how long ago it was because the club -- the

16  management of the club had to guaranty the owners five

17  thousand a week.  So part of that, that was all

18  distributed to all of the owners.

19          But I didn't -- for a while there, nobody

20  took any money.  And so for working in the club and being

21  the consultant, I took a consultant fee they gave me.  I

22  think that was in -- I don't know.  Is it there?  That

23  was in 2010 I believe.

24      Q      I do see some miscellaneous records from

25  2011.  They don't look like they are in order so I can't

1    tell you if everything is here or not.  I can tell you

2    that there are some other deposit amounts that are even

3    numbers.  For example, from June 20 to July 1st, there is

4    some deposits, one of six hundred seventy-seven dollars,

5    the other three are fifteen hundred dollars each.

6         A    The fifteen hundred dollars each would be a

7    consultant fee.  The six hundred dollars was social

8    security.

9         Q    Who was paying you a consulting fee?

10        A    Congress Plaza was or Palm Steak House was.

11        Q    Did you have an agreement with them as to a

12   specific amount of consulting fee to pay you?

13        A    No.  Actually, most of -- I have a consultant

14   agreement, yes.  They don't mention any specific amount

15   at all.  They state what my authorities are, my duties

16   are, and that type of thing.

17        Q    Who did you negotiate that contract with?

18        A    David Goldstein.  The consultant agreement

19   you mean?

20        Q    Yes, sir.

21        A    David Goldstein is one of the owners of both

22   Congress Plaza and Palm Steak House.  He is also the

23   trustee for the Nolita (phonetic) Trust which represents

24   his fifteen percent.  I guess he has a trust for his

25   kids.  And he's also the trustee for the Palm Beach

1    Gentlemen's Club, PBGC Trust, and Suzanne is the

2    beneficiary of that and she has -- that represents

3    seventy percent of the steak house.  Her interest in the

4    property is in her name.

5              The reason we went with the trust on the Palm

6    Steak House is because when I first won the judgment back

7    in '05 or '6 -- well, it was '05, we went and met with

8    the DABT.  That's the -- the DABT is the Florida Division

9    of Alcohol, Beverage and Tobacco.

10              And we explained to them, listen, I won a

11    judgment, I won a business, I have a record, I can't get

12    a liquor license.  How do we do this and who does it

13    rightfully belong to.

14              So we established that Suzanne was the

15    rightful owner of the club and the -- which I'm going to

16    show you that here -- the rightful owner of the club and

17    the property since 1995.

18              So they suggested and worked out with the

19    lawyers to form a trust, let the trust get a license with

20    Suzanne the beneficiary.  Otherwise if she went as an

21    individual and owned it as an individual, Suzanne, then

22    her spouse had to get fingerprinted, which is me, and we

23    would have ran into problems.

24         Q    You are saying the state recommended this?

25         A    Yeah.  We discussed it.  I went right down

1    and discussed it.  I knew them because when I was in

2    jail, I took their depositions a hundred times.  We

3    didn't hide anything from them.

4         Q    This is what agency?

5         A    The Division of Alcohol, Tobacco, and it's

6    under the Department of Business Regulation.  So, you

7    know, they told us to work it out.  We did.  They come

8    back and they said, yes, this is fine, just keep

9    Mr. Farese's name off of it otherwise he has to be

10   fingerprinted and if he gets fingerprinted, we are going

11   to deny the license.  So it was kind of a dilemma that I

12   was put in.

13             And maybe that's a good time to show you this

14   one document.  I want to show you what my -- okay.  This

15   originally, the original owner of this property from

16   Harald Dude -- and I'm handing you this cancelled check

17   for ninety thousand dollars from Management Consultant

18   Systems to Southfield Farms.  That's the -- there is

19   actually four checks that came to about a hundred fifty,

20   a hundred sixty thousand.  I have been trying to get the

21   other ones from Bank America.  I believe they have been

22   filed in the bankruptcy court, and I won't know that

23   until I get the archives.

24             This is my wife's check when she first bought

25   the property that we are talking about today.  That

1   represents her ownership.  And we had -- you know what we

2   did when I was away, Suzanne -- we all ran out of money

3   fighting Mr. Dude.

4              So in order to keep fighting, we resolved all

5   of this by me taking assignments from Suzanne, from

6   Management Consultant Systems, from all of the companies

7   that we used.  I took the assignments, and then I filed

8   the lawsuits.

9              And it was raised -- I know Mr. Goodman

10  brought up yesterday about standing.  There has always

11  been a standing with me because lawyers hate to see me --

12  I don't know why -- they hate to see me file or get

13  involved in an action.  I don't know why, but it happens

14  to be the truth.

15             And I'm going to show you from Brad Beilly,

16  another fighting thing he did.  Actually, in that

17  instance, he was correct.  But, anyway, they did argue

18  well, Mr. Farese -- and I'm going to get -- this is one

19  of the things I want to get you because I want to prove

20  that this property was Suzanne's since 1995, not mine or

21  anybody else's.

22             Mr. Farese -- the lawyers, Rosenbach,

23  Beltrano and, you know, Dunkle, he had four or five

24  lawyers there.  They are all saying, how -- you don't

25  own this property.  Your wife owns this property.  You

1    have no right.  You have no right to be taking this

2    lawsuit.

3              So then we had to get into the whole thing

4    about assignments.  We produced all of the assignments.

5    And I also know that in Florida, you don't have to have a

6    written assignment.  They can be oral.  And I know your

7    eyebrows went up.  I wanted to show you that.  The

8    assignments I'm talking about are in writing.

9              Here is the Eleventh Circuit.  Very clearly

10   they state about an oral agreement.  You don't even need

11   a witness or anything else.  It's crazy.  But that's the

12   way it is in Florida.

13   Q     You are showing me an opinion from the

14   Eleventh Circuit Court of Appeals in a lawsuit of Lynn

15   Stewart versus Hooters of America.  It looks like it's

16   something that -- it's a written opinion that says do not

17   publish, but you are saying law on oral assignment.  I

18   guess if anybody wants to find it, it's 10-11607, Lynn

19   Stewart, S-t-e-w-a-r-t, Lynn is L-y-n-n, and it's Hooters

20   of America, Inc.  You have underlined where they cite,

21   they being the Eleventh Circuit, two Florida appellate

22   decisions saying, under Florida law, an assignment need

23   not be in writing.  And then finding, the district court

24   did not err in finding a valid oral assignment under

25   Florida law.  And they cite to Mangum, M-a-n-g-u-m,

1   versus Susser, S-u-s-s-e-r, 764 So.2d 653.  It's a

2   Florida District Court Appeals 2000.  They don't give

3   what DCA.  And they cite Boulevard National Bank of Miami

4   versus Air Metal Industries, 176 So.2d 94.  That looks to

5   be a Florida Supreme Court Case from 1965.  I'll give

6   this back to you.  Is that the reason you wanted me to

7   see it?

8        A     Yes.  I just wanted you to see it because

9   Judge Middlebrooks made a ruling that the assignments

10  were valid and that I stood in the shoes of Suzanne so

11  long as I held her assignments.  And that's how I

12  proceeded under the RICO because I never owned the

13  property.  I actually never even owned the club ever,

14  ever.  Suzanne owned it right from the very beginning.

15  All of the money came out of her checkbooks or her

16  company checkbooks.  I never owned any of it.

17            But in order to keep fighting, I took their

18  assignments, and that's what happened.

19       Q     Your position is that you took assignments of

20  her interest for purposes of the litigation with

21  Mr. Dude?

22       A     Exactly.

23       Q     At any point, did you then assign back to

24  Suzanne her interest?

25       A     Yes.  In Palm Steak House first.  It's

1   actually in the -- I gave her -- I think it was in

2   February or whenever it was there.  I assigned to her --

3   no.  I assigned to Palm Beach Gentlemen's Club, the

4   business, when I gave them a sublease, and I brought --

5   as a matter of fact, I was copying the leases when my

6   thing went out.

7               I had a sixty-year lease as part of the

8   settlement.  From the sixty-year lease, we formed Palm

9   Beach Gentlemen's Club.  We needed the separate entity

10  because what I told you about with the licenses.

11              I assigned the business -- I gave them a

12  lease for thirty years, a sublease, but in that lease,

13  I also assigned the furniture, fixtures, and

14  business because I couldn't have any of that in my

15  name at all, but I got it from the judgment because

16  as part of the judgment, I owned the business, I

17  owned -- you know, the judge gave me the thirteen

18  million which I didn't collect by the way, but that's

19  another story.

20              So, yes, I did it then, and that goes to

21  2007.  And of course you -- when you check all of the

22  records -- Suzanne is giving me the permission and David

23  did this morning, I don't know whether I brought the

24  e-mail or not, as the trustee to give you whatever

25  records on Palm Steak House you want as well even though

1   I don't think that there is any -- I don't think it's

2   within the administration of the estate.  But I'm going

3   to give them to you.  I'm jumping around.

4        Q     Hopefully I can have an idea where I'm going.

5   You understand we are looking to determine if in fact at

6   some point you did own these interests through you are

7   saying an oral assignment from Suzanne.  You are telling

8   us that it went back?

9        A     No.  That was a written assignment from

10  Suzanne.

11       Q     You are telling us at some point, you

12  transferred back to Suzanne --

13       A     Yes.

14       Q     -- her interest?

15       A     Yes.  I did it orally, and then I did it --

16  in the club, I did it in the lease, and there is another

17  assignment, you know, orally to her, David and -- you

18  know, we sat around, and I owed them.  They had to get

19  their thirty percent from me because they did the trial.

20  I'm too emotional to speak.

21       Q     We will go through all of that.  Those are

22  things if there are documents here today, I don't need

23  you to pull it out now because we are going to go through

24  them in order.  If there are things that you still need

25  to get, those are things we are looking for to determine

1    when a transfer did occur, how a transfer occurred and

2    the facts surrounding it.

3         A    I will show you all of that, and I can show

4    you e-mails from Flagler Bank asking other people

5    uninvolved because everybody thought that I owned

6    everything because -- I just got to tell you this one

7    thing.

8              As part of the settlement -- you know, when I

9    won the judgment, trying to get the money from Dude was

10   something else.  My brother Deitmar owns it.  He's in

11   Germany.  He's in Hamburg.  So we all said, listen, we

12   are going to chase this money for the next twenty years.

13   Let's -- he wants a settlement.  Let's give him a

14   settlement.

15             The settlement was if we won the appeal -- we

16   took a deed.  He gave me the deeds.  We put them in

17   escrow with Jennifer Labbe who is a local lawyer up here.

18   If he won the appeal, then the deeds get torn up.  And

19   all I have is the lease, the sixty-year lease.  If I win

20   the appeal, I keep the deeds and the lease.  Okay.

21             The court of appeals overturned the RICO and

22   they sent it back for a new trial.  They actually wanted

23   us to take a rescission case back in state court that it

24   belonged in -- I think the legal reason was they said

25   because I had made partial settlement in the state court,

1    they wanted to see that get settled.

2              But in any event, as far as the settlement is

3    concerned, which I think I have that, as far as the

4    settlement is concerned, if the case was overturned for

5    any reason, it didn't matter what the reason is, even if

6    the judgment was a dollar less, we rip up the deeds.

7    That's what happened.

8              I lost the property.  We lost the rights to

9    the thirteen million, all out the window.  I did wind up

10   with the lease for sixty years.  So now the goal is to

11   protect the lease no matter what because that's the only

12   income you have got.

13             That's how I wound up, why everybody thinks,

14   oh, Farese has got the deeds, he owns this.  Farese

15   doesn't own anything and neither did Suzanne after the

16   judgment.  It all got ripped up.  And all of this is in

17   the books.  I'll have to point you to it, but you can

18   look all this stuff up.  It's all in the books.

19             So after everything was through, we made the

20   lease.  We had the sixty-year lease which was also held

21   in escrow by Labbe.  But after I lost the case, I got the

22   lease released to me and that gave me ownership of the

23   business and the premises by lease.

24             There was also an option to buy the property.

25   That's very important.  Because over the years, we tried

1  to settle this so many times you would think that after

2  Middlebrooks made the statement about pushing rocks up

3  the hill all of the time, and he was absolutely right,

4  for ten years of litigation, Harald for some reason still

5  didn't like the idea that I was in the club and he

6  wasn't.

7          He makes a deal with Jeff George and the

8  whole thing started all over again.  Apparently George

9  and his father and his cohorts wanted the club because

10 Harald signed everything over to them.  And I think I

11 have some of that here.  He signed everything over to

12 them so now we had to start lawsuits with George.

13         The Congress Plaza when we first started

14 settling with George and Harald first in February is when

15 the first assignment took place.  It was right after

16 February -- say not February 3rd, but like a week after

17 February 3rd.

18     Q     What year?

19     A     That would have to be 2009.  This is the

20 first -- this is actually the second agreement that we

21 got serious about.  And you will see -- just let me get

22 the date for you.  This is February 3, 2009.  And this

23 is -- you will see it's not signed, but you will see all

24 Goldstein's handwriting on that if you look page by

25 page.

```
 1         Q      This was a draft?
 2         A      That was a draft when we first tried to get
 3    things settled.  This went on for two months like this.
 4    During that two months, I started changing the name of
 5    the Riviera Yacht Club.  I took myself off as -- I stayed
 6    on as a manager, but I resigned as a managing member.
 7    For six months or four or five months, there was no
 8    managing member.  There was -- there were no members.
 9    It was absolutely nothing.
10               That happened I got to say within a
11    month after this, but I will find all of those
12    documents as well.  There is letters.  There is all
13    kinds of things.
14         Q      Let me try and stay on track as best we can
15    at least on the documents.
16         A      Well, I think this is important because
17    it establishes when we first tried to settle with Dude.
18         Q      I think it's probably going to relate more
19    to I don't know if it's going to be twenty-seven or maybe
20    some of the other requests in here, but certainly we are
21    going to get to this.  I think you have other documents
22    that relate to this; right?  You have other documents
23    that relate to this whole settlement?
24         A      I do.
25         Q      Keep them together.  Right now let me stay on
```

1   the bank records.

2          MR. GIRARDI:  Mr. Farese, we will get to

3      those documents.

4          THE WITNESS:  Do you want the leases?

5          MR. BAKST:  Not yet.

6          MR. GIRARDI:  Let Mr. Bakst ask the

7      questions, and we will get to the documents as

8      they come up.

9   BY MR. BAKST:

10      Q    I'm going to keep together the bank records

11  that you provided.  We will copy that.  You handed me as

12  some bank records some checks, but they are not yours.

13  They are checks from '95.  It looks like it's two copies

14  of the same thing, and it is showing ninety thousand

15  dollars paid to --

16      A    Southfield Farms.

17      Q    -- Southfield Farms from a company called

18  Management Consultant Systems, Inc. from July 24, 1995.

19  And it looks like a check signed by Suzanne Farese?

20      A    If you look at the memo, for the record, it

21  says for Palm Beach Partners which was the owner of the

22  property.  That is Harald Dude's partnership.  That was

23  the registered owner of the property at that time.

24      Q    Hold on to this.  I think it relates to Palm

25  Beach Partners, it relates to Congress Plaza, it relates

1    to those entities?

2         A      Right.   It relates to Congress Plaza because

3    it's the same property.

4         Q      I understand.   Going through the bank

5    records, other than what you have handed me, are there

6    any other bank records that you have today?

7         A      Yes.   I can't tell you what is here, but we

8    do have the Congress Plaza records.

9         Q      We will go through that.

10        A      My bank records, that's the only ones I

11   brought.

12        Q      Why don't you tell me -- I'm going to take a

13   second and get some post its so we can identify what is

14   going to be marked because we are going to have to copy

15   everything.   I'll be right back.

16        A      You don't have to copy these because I

17   have those in my computer.   She downloaded those

18   already.

19              MR. BAKST:   Okay.   We can take five minutes.

20              (Whereupon, a short recess was taken.)

21              MR. BAKST:   I'll make Exhibit 1 the folder of

22        tax returns.   Exhibit 2 will be a composite of the

23        bank records.

24              (Whereupon, Trustee's Exhibit Number 1 and

25        Trustee's Exhibit Number 2 were marked for

```
 1          identification.)
 2   BY MR. BAKST:
 3          Q     Did you have some other bank records that you
 4   want to show me for Congress Plaza?
 5               MR. GOODMAN:  Can I ask a question?  Let me
 6          ask a question.  There are documents being marked.
 7          I would like to look at them.  Are you saying, is
 8          it the position on this side of the table, that I'm
 9          not allowed to look at the documents being marked
10          at this 2004 examination?
11               THE WITNESS:  It's okay with me if it's okay
12          with Matt that you can look at them.  I don't want
13          you to have a copy until the judge rules.
14               MR. GIRARDI:  I don't have an issue with
15          reviewing the documents.  You have filed a motion
16          for protective order.  All of this -- we feel the
17          right to have all of this resolved by the judge and
18          what will be turned over will be turned over if and
19          when the exam is reset.
20               MR. BAKST:  I can show him these documents to
21          review today?
22               THE WITNESS:  It's okay with me.
23               MR. GIRARDI:  I don't have a problem with it,
24          but I think if you want to object to him seeing it,
25          I think you have that right until next Thursday's
```

1     hearing.

2          THE WITNESS:  I think he's recommending that

3     I don't.  I don't want to go against him.

4          MR. BAKST:  That's --

5          MR. GOODMAN:  I think it's highly unusual.  I

6     don't have the experience in bankruptcy court like

7     Michael does but --

8          THE WITNESS:  The rule was very clear.

9          MR. GOODMAN:  I think it's unusual for an

10    interested party attending a 2004 exam noticed by

11    the trustee's counsel to not be entitled to review

12    the documents that are being marked.  Would you

13    agree with that?

14         THE WITNESS:  The rule said --

15         MR. BAKST:  Right now there is a pending

16    motion.  I have my own views, but I'm not a part of

17    that particular dispute as far as records.  So I

18    don't want to do anything today that is going to

19    somehow delay the trustee being able to see any

20    documents.  So all I'm going to do is if the

21    position of the debtor is I can't show them to you,

22    certainly you can raise that before the Court and

23    it certainly may mean that the time spent if you

24    get a right to take a deposition will be even

25    longer because you haven't seen them beforehand.

1      But those are issues that Judge Kimball is going to

2      decide next week.  So tell me one way or the other,

3      can I show these to him or not?

4          THE WITNESS:  Will you put it on the record

5      you are not going to show these to third parties

6      and pass them around and tell people what is in

7      them?

8          MR. GOODMAN:  It's my understanding I'm not

9      being provided with a copy.

10          THE WITNESS:  When you read what is in them,

11      will you make them confidential?  Nobody wants this

12      stuff -- you know, I saw you giving newspaper

13      articles about me to people last week and this

14      week.  Yesterday you were bringing it up to

15      Roderman.  When you do that kind of stuff, it makes

16      me afraid to --

17          MR. GOODMAN:  Are you referring to the

18      article that was on -- that is presently on Barry

19      Roderman's web site?

20          MR. GIRARDI:  Can we try and stay on track

21      with regard to the bank statements.

22          THE WITNESS:  Yes.

23          MR. GIRARDI:  He's most likely going to be

24      entitled to see them anyway, but I think you have

25      the right to hold off.  The hearing is less than

1      ten days away.

2           THE WITNESS:  I do want to facilitate the

3      request as long as you tell me they are

4      confidential and you are not going to be slandering

5      me everywhere.

6           MR. GOODMAN:  I don't know how to respond to

7      that.  It's not my intent to slander anybody.

8           THE WITNESS:  Did you show that article to

9      other people besides the people in the deposition

10     today?

11          MR. GOODMAN:  The article is published on the

12     worldwide web presently.

13          THE WITNESS:  With all due respect, that's

14     not my question.  You don't have to answer it.  I

15     have to answer Mr. Bakst's questions.  I just don't

16     want you slandering me, trying to poison my

17     background with people.  And I know you did it at

18     the 341 meeting.  Why do that?  The truth is all

19     here in these documents.

20          MR. GOODMAN:  It's not my intent to slander

21     anybody.  I don't want to be held to any unilateral

22     confidentiality agreements.

23          THE WITNESS:  You don't want to give me

24     confidentiality of the documents?

25          MR. GOODMAN:  I have a duty to redact

1    confidential information as a filer.  I understand

2    all that.  I don't want to have --

3         THE WITNESS:  Let's have Judge Kimball settle

4    it.  I'll ask him for confidentiality, not of the

5    things I give to Mr. Bakst which I'll give him

6    anything.  He can come in my house and take

7    whatever he wants.

8         MR. GOODMAN:  I don't publish tax returns.

9    That would just be stupid.  I don't do that.  I

10   endeavor to practice --

11        THE WITNESS:  I'm making a normal request.

12   Lawyers make it every day.  People say -- every day

13   they ask for confidentiality.

14        MR. GOODMAN:  I have ethical

15   responsibilities, and I agree to abide by my

16   ethical responsibilities.  I'm not going to take

17   your tax returns and start publishing them.  But I

18   need to be able to use them for the purpose of this

19   matter.

20        THE WITNESS:  Of course you can use them for

21   anything related to the case.

22        MR. GIRARDI:  That's the resolution.

23        MR. GOODMAN:  That's all I intend to do.

24        THE WITNESS:  If you say that, I have no

25   problem with you having them.

1              MR. GOODMAN:  What's the decision?  Can I

2        review the documents that are being marked?

3              THE WITNESS:  If you make the statement that

4        they are confidential except as related to this

5        case.

6              MR. GOODMAN:  I have said what I -- I said

7        that I agree to be bound by ethics which I'm bound

8        by anyway, and I don't -- I'm not saying that I'm

9        agreeing to any confidentiality more or less than

10       everyone else, all of the other lawyers, in this

11       room have.  And I'm trying to be fair here.  I just

12       don't want there to be unilateral confidentiality

13       agreements.

14             THE WITNESS:  Okay.  Then the answer is no.

15       We have gotten -- every judge over there has signed

16       confidentiality orders involving all of these

17       records.  I brought some of them with me.

18             MR. GIRARDI:  Well, then we will wait until

19       next Thursday's hearing.  The documents will be

20       available and will be provided, whatever are to be

21       provided.

22  BY MR. BAKST:

23       Q    Mr. Farese, let's stay on bank records.  Do

24  you have other banks records that you are going to show

25  me?

1       A       I have Congress Plaza, some of their bank

2   records.

3       Q       Can I see what you have for that?  Thank you.

4   You are handing me an envelope with some documents in it.

5   The folder says on it, the envelope says, Congress Plaza

6   bank statements.  I'm looking at bank account TD Bank

7   last four numbers are 2497, bank statements.  They are

8   not in any particular order.  At least the first one I

9   see is April 2012.  I see one from August 2011 and

10  various other months in 2012 and 2011.  Mr. Farese, are

11  you able to sign checks on this account?

12      A       No, sir.

13      Q       Who can, if you know?

14      A       Congress Plaza is just Suzanne.  I believe

15  just Suzanne.

16      Q       I see, for example, a deposit of two hundred

17  thousand dollars on October 30 of 2012.  Do you have any

18  knowledge as to where that came from?

19      A       Two hundred 2012 December?

20      Q       October 30.

21      A       October.  That was the date that they --

22  that was the date -- that was the month they did the

23  closing when they sold the property.  And that two

24  hundred thousand was put in the account.  It was either

25  from Barry's trust or from David's trust.  I'm not sure

1    which.

2            And it was put in there to -- well, Congress

3    Plaza had a lease with a parking company.  And right now

4    it's all, you know, it's wood and it's not graded so we

5    are before Palm Beach County trying to get the zoning

6    changed and the asphalt done.

7            The two hundred thousand was put in the

8    account to have -- you know, to pay for the asphalt.  We

9    figure it's going to run about a hundred and a quarter or

10   more.  So I don't know if that check went first to

11   Suzanne and then to Congress Plaza or directly to.  I

12   don't know.  But that's what it is for.

13       Q    At least from what I can see, it just says

14   deposit so I can't determine from this statement.

15       A    That's what the money is for.  They may have

16   given it to Suzanne directly, and she put it in there.  I

17   don't know how they did it.

18       Q    At least from what I have seen, it looks like

19   there is well over a million dollars that went to Suzanne

20   from that sale of the business, of the land and the

21   business.

22       A    She got a little over a million and a half

23   I believe.  I was locked up when all of this took

24   place.  I was there at the closing, and then about a

25   month later I got -- wait a minute.  Are we talking

1    about '11 or '12?

2         Q         '12.

3         A         I think I got arrested January of '12;

4    right?

5         Q         You are not asking me, are you?

6         A         My dates when I was locked up get a little

7    confusing to me.

8         Q         Do you know what happened to that money?

9         A         The two hundred?

10        Q         No.  The million and a half.

11        A         Well, whatever the net profits were after

12   they paid all of the bills, because they had to pay all

13   kinds of bills to pay, Suzanne got seventy percent of

14   it, David got his thirty (sic) percent which it's either

15   made out to David or Nolita Trust and Barry got his

16   fifteen percent of it.  They each took fifteen percent.

17              There was for a while -- there was a loan

18   taken for three hundred thousand from Mark Scott.  He got

19   paid back.  They converted it back to a straight loan

20   instead of interest.

21              So for a while there the calculations came

22   down to like maybe Barry had fourteen and a half percent

23   instead of fifteen.  Everybody's calculation came down.

24   But when they paid him off at the closing, then

25   everything went back up to the seventy, fifteen and

1  fifteen.

2       Q      Suzanne got about a million and a half from

3  this?

4       A      I'm going to say -- you know, she's going to

5  bring her records too so she will tell you exactly.  I

6  can't tell you exactly what she got.  It was between a

7  million and million and a half.

8       Q      Do you know what she has done with the

9  money?

10      A      Not every penny of it, no, but I do know that

11  she's got money in the bank.

12      Q      Do you know --

13      A      She has a trading account.  She bought a

14  duplex.  I think she bought two pieces of property.

15      Q      Do you know where they are?

16      A      They are in Delray.

17      Q      Have you received any of that money?

18      A      Not a nickel.  From the closing, not a

19  nickel.

20             MR. BAKST:  I'm going to put this back in the

21        envelope and make it Composite Exhibit 3.

22             (Whereupon, Trustee's Exhibit Number 3 was

23        marked for identification.)

24  BY MR. BAKST:

25      Q      I note that there were some miscellaneous

1    records in here as far as the bank account that seem to

2    be for -- I thought there was some 2010.  Some are 2010

3    for various months.  I see on some earlier statements,

4    it's called Congress Center, LLC?

5         A    Yes.

6         Q    It changed its name?

7         A    It went from Riviera Yacht to Congress Center

8    to Congress Plaza.

9         Q    Do you know why there were the name

10   changes?

11        A    Yes.  The Riviera Yacht was at the same time

12   we formed also -- Mike Carey (phonetic) and I formed

13   Florida Marine Club.  We were getting all of the names to

14   cover all of the bases, but Mike owned the marina.

15             And he ended up three months or four months

16   later selling the marina to Huizenga.  So we had all of

17   these companies on the shelf.

18             When I first started dealing with Harald

19   about the settlement, I changed -- I said let's use this.

20   We changed it to Congress Center.  And then from Congress

21   Center to Congress Plaza.  I was trying to keep the name

22   so they showed some relationship phonetically to the

23   property.

24        Q    Any other banking records that you have

25   today?

```
1          A     No.

2          Q     Number four deals with deeds, leases,

3   mortgages, liens, anything that you owned, real property,

4   legal or equitable.

5          A     In my own name?

6          Q     Yes.

7          A     Yes.  This here.  That's my home, and that

8   would also be the lease.

9          Q     You are showing me --

10         A     That's the 65 Northeast 4th Avenue.  That's

11  the title and the deed I think.

12         Q     Something from March of '07, a letter from

13  Paradise Home Title to you and your wife referring to the

14  Delray Beach property and the deed with a title insurance

15  policy.

16              MR. GOODMAN:  Do you have a problem if I look

17         at that?  That's public record.

18              THE WITNESS:  Mr. Goodman, we already

19         discussed it.  I don't want Mr. Bakst to start

20         getting mad at me now because we -- you know.

21              MR. BAKST:  My position is for purposes of

22         today, if you say he can look at today, fine; if

23         you say he can't, fine.  It's not my call.  Judge

24         Kimball will make the ruling.  You just tell me

25         your position.  It's not a matter of me getting mad
```

1        or not.

2                THE WITNESS:  I don't want you to start

3        getting -- I know you want to move things on.  You

4        want to see -- what do you want to see, the deed to

5        my house where I live?

6                MR. GOODMAN:  I thought those were the Delray

7        properties purchased by Mrs. Farese.

8                THE WITNESS:  No.  Those aren't mine.

9                MR. GOODMAN:  Never mind.  I don't need to

10       see that.

11   BY MR. BAKST:

12       Q    I have a closing statement from '07, the

13   price is one point three million and papers filed for the

14   ad valorem tax exemption, loan adjustment agreement March

15   of 2012.  Has the loan been modified?

16       A    Yes.  There was first a foreclosure from Bank

17   America who owned the mortgage, and then if you remember

18   all that stuff came out about the Stern law firm and all

19   that.  My case got shelved.  And as a matter of fact,

20   it's still alive today.  In the meantime, they sell the

21   note to Bayview Mortgage.  Bayview Mortgage filed a

22   foreclosure while the other one was still pending.  They

23   ended up modifying the mortgage down to nine eighty or

24   nine something, about nine eighty.  And they are the one

25   I make the payments to.  There is still a lawsuit pending

1  with Bank of America which I have to go in and get

2  dismissed.

3            MR. BAKST:  I'll mark this as Composite

4       Exhibit 4.

5            (Whereupon, Trustee's Exhibit Number 4 was

6       marked for identification.)

7  BY MR. BAKST:

8       Q    Are there any other documents you have

9  relating to real property?

10      A    There is three leases that I want to show you

11 that my name is on.  What the hell did I do with them?

12 This is one of them.  They are regular club lease.  This

13 is the first lease that I -- the settlement lease with

14 Dude.  That gives me the sixty-year lease.  That's

15 subsequently been terminated.

16           (Whereupon, Trustee's Exhibit Number 5 was

17      marked for identification.)

18 BY MR. BAKST:

19      Q    Exhibit 5 is what I'll make this lease.

20 Looks to be from December of '06.  At least that's the

21 date on the first page.  Is that when it was signed?

22      A    I think we signed it on December 20, but I

23 don't know.  Check the last page.

24      Q    I don't see a specific date on the last page.

25      A    Then it's the 6th.

```
 1        Q     Okay.  This is a lease with Congress Shopping
 2   Center, Ltd. and yourself as tenant.  This is for the
 3   property at 964 through 1000 North Congress Avenue.  This
 4   is the -- is this the sixty-year lease?
 5        A     Yes.
 6              MR. GOODMAN:  What is the date on that?
 7              MR. BAKST:  It's sometime in December 2006.
 8              THE WITNESS:  That was the one that was in
 9        escrow pending the appeal.
10   BY MR. BAKST:
11        Q     You got to keep this regardless of what
12   happened with the appeal; right?
13        A     Yes.  And I tried to keep that throughout all
14   of the litigation.  I tried to protect that.  So in 2009
15   that ended up in escrow with Beltrano for a while, you
16   know, while we were trying to settle everything.  But we
17   will get to that I guess when you are ready.
18        Q     I do remember from the deposition yesterday
19   there was some reference to your having a sixty-year
20   lease.  It was in that settlement?
21        A     Yes.
22        Q     My understanding is that as part of that
23   settlement that you reached, that this lease doesn't
24   exist anymore.  Is that right or wrong?
25        A     It doesn't exist anymore because it was
```

1    terminated.  It was terminated two ways.  First it was

2    terminated with the -- when we sold -- when we made the

3    settlement with Jeff George and his lawyer and when we

4    made the settlement with Harald.  That was both of them

5    were in 2010.

6            And then when they sold the property to --

7    the club piece -- to S and J, Scott Lizza, they wanted an

8    actual written termination of the lease so I gave them

9    that.  They wanted termination of everything.

10        Q    Did you get any money in exchange for doing a

11   written termination of the lease?

12        A    Not a nickel.  I mean when I say I don't get

13   any money, my wife pays all my bills.  I don't want to

14   say that I'm -- you know, she pays all of the household

15   bills and all that.  She pays them all.

16        Q    With this lease agreement, did you then lease

17   out the various locations within 964 to 1000 North

18   Congress Avenue to other tenants or did you run a

19   business at that location?

20        A    We didn't do that until we bought Congress

21   Plaza.  What does it say?  Okay.  They put apparently 964

22   to 1000, but it's really only 1000 of the premises, and

23   you will see it described as Exhibit A.  Was there an

24   exhibit on here?  They never put the description.  I wish

25   it was the whole thing.  But it was only Suite A through

1  H.   Does it say it here somewhere?   Yeah, eight thousand

2  square feet, approximate eight thousand square feet

3  portion of the property currently used as blah, blah

4  blah.

5          Q      What was in that location?

6          A      That was the club, unit A through H.

7          Q      What was the club called at that time?

8          A      At that time, it was actually called Bare

9  Elegance, and I had to file a lawsuit to get that guy

10  out.   That was another transfer Harald made.   And we

11  changed it to Diamonds.

12          Q      You weren't running Bare Elegance, neither

13  you nor your wife?

14          A      No.

15          Q      When it became Club Diamonds, who ran

16  that?

17          A      For the first year, I ran it as the

18  consultant.   When I say I ran it, we hired managers, but

19  I was the one that stayed in the club and oversaw it on

20  behalf of David, Barry and Suzanne.

21                I monitored just about everything that there

22  was.   David and Barry set foot in there -- well, David

23  used to stop up for lunch a lot, but not Barry.   If he

24  was in the club two or three times, it's a lot.   My wife

25  was never there until I got locked up.

1       Q     When it was Club Diamonds what year did that
2    start?
3       A     That is this lease here.  I subleased it
4    after.  The date on this one is 2nd day of April of 2007.
5    But I want you to see that because that's the first
6    assignment that I made of the club.  And if you read that
7    portion that I have -- see the little portion I put the
8    pen.
9       Q     Yes, sir.
10      A     That's the first assignment that has to do
11   with Palm Steak House and the club.  I gave it all to
12   Palm Beach Gentlemen's Club.
13              MR. GOODMAN:  What is the date on that?
14              MR. BAKST:  This is an agreement.
15              THE WITNESS:  That was in 2007 April.
16              MR. BAKST:  April 2nd, '07.
17   BY MR. BAKST:
18      Q     This first agreement is a lease agreement
19   that you had and the rent was eighteen thousand a month.
20   Were you paying that rent?
21      A     No.  The club was.
22      Q     So money was coming from -- starting in '06,
23   it was coming from Bare Elegance?
24      A     No.  There was no rent.  Bare Elegance he was
25   with Dude.  He was a friend of Harald's.  I had to go to

1    court and get an ejection, writ of possession, to get

2    them out.

3         Q      Where was the money coming from in '06 to pay

4    the lease payments?

5         A      I don't know.  We weren't in there in '06.

6    We had the lease, but we didn't have possession.

7         Q      Was anybody making payments under this lease

8    to Mr. Dude?

9         A      No.  It was held in escrow all of that

10   time.  It didn't come out of escrow with Jennifer Labbe

11   until the Eleventh Circuit ruled.  So I can't tell you

12   the exact date that we went in there.  I can look it

13   up.

14        Q      Do you know approximately what year?

15        A      It was either the end of '6 or beginning of

16   '7.

17        Q      Once that happened, did you make payments

18   under this lease?

19        A      We opened the club and we made payments, yes.

20   That's when the three hundred thousand I said we borrowed

21   from Mark Scott, it was one of David's clients, we used a

22   lot of his money to get the club going and remodel it

23   and, you know, because it was a shambles.

24        Q      This is now a lease between yourself and Palm

25   Beach Gentlemen's Club?

1      A      Yes.

2      Q      You have highlighted the part that says

3  simultaneously herewith, lessor -- which was defined as

4  yourself; it doesn't define lessee, okay -- agrees to

5  assign to lessee all of the assets, furniture and

6  fixtures, equipment located in the premises and the

7  good will and the business known as Club Diamonds,

8  Diamonds, Diamonds Cabaret and Bare Elegance and all

9  fictitious names, rights and privileges associated

10  therewith.

11      A      I put all of those names in there when we did

12  this because you never know what Harald was going to pop

13  up with, some other name of some other company.  So we

14  made sure we covered it all.

15      Q      Did you receive any money or other

16  consideration in exchange for assigning all of those

17  assets?

18      A      I received no cash payment, no.  But of

19  course I did receive the services from David and Barry.

20  They owned thirty percent of Palm Beach Gentlemen's

21  Club.  They owned thirty percent of that.  That was their

22  fee.

23          And as far as Suzanne is concerned, Suzanne

24  owned it before this whole thing started in 1995.  She is

25  the one who actually bought Florida Ventures.  She

1    bought -- Florida Ventures was the owner of the club at

2    the time.

3              She owned it.  I didn't own it.  That's what

4    the whole -- when they charged me with undisclosed

5    ownership, the judge ruled in my favor.  There was not

6    undisclosed ownership.  Mrs. Farese owns it.

7              The government stepped in and tried to take

8    it.  They said Tommy owns it.  The judge ruled Tommy

9    doesn't own anything.  You are not getting any

10   forfeitures.  This is Mrs. Farese's and that's it

11   because she showed where all of the money came from.

12   And that check is part of it that went towards the

13   property.

14        Q    What you just referenced there as far as the

15   government trying to seek forfeiture --

16        A    They arrested me back in -- I was home.  They

17   violated my parole and arrested me in 1996.

18        Q    This is more than ten years ago?

19        A    Oh, yeah.  Way back.  But it's important

20   because that's when Suzanne bought all this stuff.

21        Q    But you would agree that sometime after that,

22   she did assign it all to you so that you could do the

23   Dude litigation?

24        A    She did, yes, absolutely.

25        Q    What I'm trying to determine is how it was

1   assigned back.

2        A      Okay.  She got the club back from this.

3        Q      This is what I'm marking as Exhibit 6?

4        A      Yes.

5               (Whereupon, Trustee's Exhibit Number 6 was

6        marked for identification.)

7   BY MR. BAKST:

8        Q      I'm trying to determine the consideration to

9   you at the time you are telling me is that -- one thing

10  you are telling me essentially you believe she always

11  owned it so that's why you were doing this?

12       A      I didn't believe that she always owned it.  I

13  knew that she always owned it.  And that's in testimony

14  in the RICO case.  My testimony, hers before Judge

15  Barkdull, before Judge Hyman, this is all over all of the

16  records.

17       Q      When she assigned her interest in --

18       A      The claims, yes.

19       Q      -- the various causes of action to Congress

20  Partners and Palm Steak House, what was the agreement

21  between you and Suzanne as to not just why she was doing

22  it but under what circumstances it would ever come back

23  to her, if ever?

24       A      The circumstances were that she always owned

25  it, and if I won it, she gets it back because she's

1    entitled to it.  Now this is one of the questions they

2    asked us, and I'm going to give you the same answer that

3    I gave on the stand to Mr. Rosenbach when he asked me,

4    and my wife gave the same answer.  Our marriage is

5    thirty-five years.  We don't look at something this is

6    Suzanne's, this is Tommy's, this is Suzanne's, this is

7    whatever this is, Tommy and Suzanne own it together.

8    Everything.  Everything is theirs together.

9            But because of this lawsuit, Mr. Rosenbach,

10   the judges wouldn't let me proceed.  I think it was

11   Barkdull that said, I don't care how you and your wife

12   feel, you have to have an assignment.  I didn't know what

13   an assignment was back then.  I went to the books.  I

14   read it.  I saw what had to be done, and we did it.

15   Okay.  Now can I proceed and fight for our rights, and

16   that's what happened.

17            So was there an agreement or something, yes.

18   Everything that she owns, I own.  Everything that I own,

19   she owns.  No matter whose name it's in.  That's how we

20   feel about it.

21            The property, this house that you got, when

22   we bought the house the title girl put Thomas and Suzanne

23   Farese.  I said wait a minute, wait a minute.  I don't

24   want my wife's name on it.  I'm buying this.  I don't

25   like to involve my wife's name in anything.  I'm sorry,

1   Mr. Farese, the law is you own it tenants -- I don't

2   know, I really didn't know what she was talking about.

3   So they put both our names on the deed.  That's how she

4   got on the deed, but she's not on the note because that's

5   how we feel.

6              And that's the only way I can express it to

7   you.  You can ask her.  You will ask her I'm sure when

8   you take her deposition.  She is going to give you the

9   same answer because she testified to that as well.

10       Q    Mr. Farese, if you believe that what you own

11  she owns and vice versa --

12       A    Yes.

13       Q    -- then it would logically follow that you

14  would have an ownership interest in the money obtained

15  from the sale of Congress Plaza and Palm Steak House,

16  wouldn't it?

17       A    If you want to follow that to its logical

18  end, then we own it tenants in the entirety.

19       Q    That's another argument.

20       A    That's what they argued also.  That's exactly

21  what it came down to.  And, you know what, that's what

22  the case law says.  I'm just -- who wants to get into all

23  that?  My wife owned it.  She put the money up for it.

24  Let's trace the money back.  She bought it.  It's hers.

25  She's entitled to get it back.  It's her money.  What do

1    I do, beat her out of the money.

2              Either way you want to look at it, fair is

3    fair.  She put up the money.  There is the check.  I'll

4    get you the rest of them as soon as Bank America responds

5    to the subpoena.

6         Q    With Palm Beach Gentlemen's Club, LLC this is

7    now an entity at that time I think you said that Suzanne

8    owns seventy percent?

9         A    Originally it was seventy-five because

10   Dude -- when it was originally purchased, she owned

11   seventy-five, and Dude owned twenty-five.  He retained --

12   that's where all of the stuff started.  He retained

13   twenty-five percent.

14        Q    When this was signed, talking about Exhibit 6

15   in April of '07, who did you understand to be the owners

16   of I guess it would be of the membership interest in Palm

17   Beach Gentlemen's Club, LLC?

18        A    PBGC Trust.  The trust that is seventy

19   percent, the trustee is David and Suzanne is the

20   beneficiary.

21        Q    PBGC Trust held seventy percent of the LLC?

22        A    Yes.

23        Q    I'm sorry, and the trust you are saying was

24   Suzanne is the beneficiary?

25        A    Right.

1        Q      The trustee was whom?

2        A      David Goldstein.

3        Q      Do you have an understanding as to why

4    ownership was held in that manner?

5        A      Yes.

6        Q      Getting back to your conversation with the

7    Department of Alcohol, Firearms and Tobacco or something

8    like that?

9        A      Yes, because if she held it personally, then

10   the spouse has to get fingerprinted and that would

11   preclude the license.

12       Q      Then the other thirty percent was held by

13   Mr. Goldstein and Mr. Roderman?

14       A      Yes, fifteen percent each, which was the

15   agreement that we had.  When I came home from prison,

16   of course Barry I knew for years and years.  So we

17   hired Barry and David.  I didn't -- you know, I can't

18   do a trial.  I'm too emotional to do a trial.  So we

19   hired them, and they got thirty percent of whatever we

20   won.

21       Q      By virtue of your entering into this lease,

22   did you have any agreement as to how you would have any

23   future employment or any sources of income by virtue of

24   your agreeing to lease this?

25       A      I had no source of income, but I did have

1   an -- it was shortly after that -- I mean I'll get it for

2   you when I come back next week, but shortly after that,

3   had to be a month or two later, they gave me a consulting

4   agreement only because -- well, first of all, I'm in the

5   restaurant business all my life since I'm a kid.

6           David and Barry weren't going to go in the

7   club.  They are lawyers.  Okay.  So they are not going to

8   run the club, but they are entitled to their end because

9   they did the work.

10          Suzanne is not going in a strip club.  So,

11  you know, who is going to do it.  So quite naturally as I

12  have always done, I looked after my wife's affairs and I

13  went in and rebuilt it, and I was in charge of doing

14  whatever had to be done up until the time we gave the

15  management to Ghahan.

16       Q     That's a whole another lawsuit?

17       A     It is, which I'm looking to get relief from

18  stay because I want to pursue that.  I want relief from

19  stay to pursue this one too.

20       Q     I know you were here for part of yesterday.

21  I don't know if you were here for that part.  I want you

22  to understand that that cause of action is property of

23  your bankruptcy estate.

24       A     I know.  David Merrill explained that to

25  me.

1      Q      This lease, Exhibit 6, says that there would

2  be four hundred twenty thousand dollars paid at

3  thirty-five thousand dollars per month as the base rent.

4  There is various other provisions in here.  Was that

5  money paid?

6      A      No.  Eighteen of it was.  The rent was paid

7  to Harald.

8      Q      Why wasn't the rest paid?

9      A      The club wasn't doing well enough.  As a

10  matter of fact, that's one of the things that started the

11  trouble.  After about a year, Harald filed an eviction

12  notice because he wasn't getting all of his money.  The

13  club wasn't making it.  From a business standpoint, the

14  club went after a higher end clientele that just didn't

15  have any money.  After the economy fell out 2005, those

16  guys weren't around to spend that kind of money.  Didn't

17  start making money until we went blue collar which was

18  about a year and a half later, two years later.

19      Q      The eighteen thousand was being paid?

20      A      Yes.

21      Q      Did that stop at some point?

22      A      Yeah.  We missed a couple of payments.  We

23  were late.  We were probably in arrears at one point

24  maybe forty thousand.  Then of course when the stuff

25  started with George, we put all of the payments in the --

1  what do you call it -- registry of the court.

2              And when we made the settlements with Harald,

3  you will see some checks in there from -- because as an

4  incentive for him to enter the settlement agreements,

5  well, I want you to give me twenty thousand on the rent

6  that you owe me.  So to get him to the table, okay, Palm

7  Steak House will give you this twenty or this ten or

8  whatever.  You will see it's all in the checks.

9      Q    Are there any other documents responsive to

10  number four, leases or similar written instruments?

11     A    There is another lease, but I don't think --

12  there is another lease between myself and Suzanne.  I'm

13  not sure if I signed it me or if -- I think it's Congress

14  Plaza signed it, and I think Mr. Goodman has it.  I think

15  that's the one that is recorded.

16             And we entered that lease sometime in the

17  beginning of '09.  It could have been in May of '09, but

18  I'm not sure because we had several agreements with

19  Harald.  But we entered that lease because Harald -- in

20  that same year if you look at that one I showed you that

21  David was going over, Harald without me knowing it while

22  he's dealing with settling with me, he goes to Jeff

23  George and whatever deal they made he sells Congress

24  Shopping Center to George.  So George becomes the

25  landlord.

1           George gives them a mortgage for two point

2    three million to Congress -- Congress Management takes

3    the mortgage which is Harald and Deitmar.  So then when I

4    was dealing with Harald to settle this, George and his

5    father they get lawyers and their position they are going

6    to court saying we own the property now, we want to evict

7    Farese, we want the club.

8           So Harald and I and Aldo, and it was supposed

9    to be Barry and David, but Harald only wanted to meet

10   with me.  He's the one that made me go into the thing

11   with just my name and/or assigns.  Unless I was there, he

12   wasn't going to deal.

13       Q     He being who?

14       A     Harald.

15       Q     Harald Dude?

16       A     He was really it.  So I said, okay.  We met

17   at Aldo's office.  And we worked it out.  I said, listen,

18   you guys can assign, sell to Congress Plaza or assign to

19   Congress Plaza, the rights to the mortgage because if you

20   don't foreclose, that's the only way that I see to get

21   George out of there.  You legally signed these documents

22   and gave it to him so the guy has a beef.  Regardless of

23   what your deal was, you did sign the documents.

24          So they said, well, you take the foreclosure.

25   I said, why should I take the foreclosure and more

1    headaches with the litigation.  I'm seventy.  I want out

2    of litigation.  They wouldn't do it unless I took the

3    litigation.  Okay.  Let's make the deal.

4            They assigned the mortgage for two point

5    three million to Congress Plaza.  I had to guaranty it.

6    In other words, they took the George mortgage -- which I

7    think I have it here -- they took the George mortgage

8    and they assigned it, George owing Harald's company the

9    two point three million.  They assigned it to Congress

10   Plaza.  As a consideration or as part of the deal, I

11   think there was a check.  I don't remember, but I think

12   we gave them ten or twenty thousand towards the rent.  I

13   don't know.  It will be there when you go through the

14   accounts.

15       Q    This is the other lease you are talking about

16   from mid '09?

17       A    No.  To protect -- because I said to Harald,

18   listen, Harald, Aldo, all this legal maneuvering and

19   rankling, something could happen, you know, especially at

20   my age.  I'm going to lose this sixty-year lease.  It's

21   going to be in jeopardy.  And I'm not doing anything that

22   puts that lease in jeopardy.

23            So we worked it out that said Aldo would take

24   the lease in escrow.  I think there is a letter that says

25   that somewhere.  I think that's what it is.  And there

67

1    would be -- we would enter a new lease.  So we entered a

2    new lease which is the lease that went to Suzanne.

3              But I think David -- that's who it was.

4    Congress Plaza gave -- because Congress Plaza was taking

5    title to everything, they were the one taking the George

6    mortgage, Congress Plaza gave Suzanne individually a

7    lease that is supposed to supplant the sixty-year lease

8    if something went wrong and I blew the sixty-year lease.

9    Okay.

10             Because, you know, I'm sure no one knows

11   better than you, once you get in court, you don't know

12   how a judge is going to rule.  You could be surprised

13   either way.

14             So I said, I'm not, I am not, jeopardizing

15   the sixty-year lease.  I'll just sit back.  We will

16   operate the club and we'll make a week's pay.

17             So that's how we settled that.  So there is

18   another lease, and it's filed in the public records, and

19   I believe Mr. Goodman has a copy of it.  I have a copy of

20   it too.  I have to dig it out.

21        Q    If you can, send it to your attorney.  This

22   is a lease from Congress Plaza to Suzanne?

23        A    Correct.  Congress Plaza is landlord and

24   Suzanne as an individual, the lessee.  Yeah, the

25   lessee.

1      Q      Congress Plaza at that time -- first, what

2  year was this?

3      A      I think it was '10.  It was either the summer

4  of '09 or the summer of '10.  I don't know until I go

5  over all of the documents.

6      Q      You are saying it's -- I guess this only came

7  into effect if for some reason your sixty-year lease was

8  not effective?

9      A      Right.

10     Q      You already had a sixty-year lease.  There

11 are certain interests you think were assigned pursuant to

12 Exhibit 6 in '07?

13     A      Yes.  The sixty-year lease was no good as

14 long as that was in effect because that's thirty years.

15 In other words, I was saying if Palm Beach Gentlemen's

16 Club -- they could lose their license tomorrow.  If a

17 couple drunks come in and have a fight, they snatch the

18 license.  So I was looking for some -- you know, this

19 whole thing was to protect the fact that we had the

20 premises.

21     Q      Is Exhibit 6, the '07 lease, is it in place

22 today?

23     A      Which one; Suzanne's?

24     Q      No.  This one between you and --

25     A      No.  They wanted that terminated when they

1   bought the place.

2        Q     That occurred in 2012?

3        A     Yes.

4        Q     Is it your position that Exhibit 6, the lease

5   from '07, remained in place from '07 until the sale of

6   the club in 2012?

7        A     I don't have a position on that until I read

8   them.  I have to re-read what was done.  There were so

9   many things that were done.  You know, I don't -- I'm

10  just here to answer questions.

11             If you want me to formulate a position and

12  come back and see you in two days, I'll re-read

13  everything that was done and I'll say, this is what we

14  meant or that's what we meant, and I'll give you the

15  position.

16             But that -- you know, when you say is it your

17  position, I didn't know I was here to give a position.  I

18  thought I was here to just tell you what happened.

19       Q     That's all I'm asking you.  I'm not asking

20  for a legal position, if that's what you are

21  interpreting.  I'm trying to determine your understanding

22  of what happened.

23       A     My understanding of what happened was we

24  entered the lease with Suzanne to put some protection on

25  the sixty-year lease because if this lease -- we felt

1    that this lease was controlling, but if something

2    happened to the license and this lease, which could in

3    the liquor business anything can happen, which it did

4    happen, I mean two or three lawsuits from customers, the

5    sixty-year lease would always stay in effect.

6         Q    Did the lease then with Suzanne and Congress

7    Plaza then ever go into effect?

8         A    No because that deal fell through also.  See

9    that's the whole thing of dealing with Harald.

10   Everything -- you know, you don't know -- we made another

11   deal that Mr. Goodman is resting on that we went right to

12   the closing, right to Mark Goldstein's office to the

13   closing, and he gets up and walks out.  This is after we

14   gave him two checks, one for twenty and one for ten

15   thousand towards the rent.  So you don't know.  You just

16   don't know.

17        Q    Are there any other documents that you have

18   responsive to Number 4 other than now what we have gone

19   through?

20        A    Another lease?

21        Q    Any other leases or similar documents, other

22   written instruments evidencing an interest or an

23   ownership in real property, legal or equitable?

24        A    No.  I did have the R-A-K, the RAK Ceramics.

25   That goes back to the time when Fred and Darlene gave the

1   loan.

2          Q      Do you have anything responsive to number

3   five, bills of sale and documents?

4          A      Closing statements, bills of sale, contracts,

5   title policies.  I think I gave it to you in this

6   package.  And the Congress Plaza I gave you; right?  Here

7   is the agreements, some old agreements, I guess my name

8   is on them.  Is this the original agreement here?  This

9   is February 21 of 2007.  This is another one.  I forget

10  which one this is.  I have to read it.  I just grabbed

11  it.  This is between me and Harald and Congress Shopping

12  Center.

13              MR. BAKST:  Make this Exhibit 7.

14              (Whereupon, Trustee's Exhibit Number 7 was

15         marked for identification.)

16              THE WITNESS:  Then you have agreement,

17         transfer of ownership of the retail strip center.

18         This is Farese and Harald.  Probably the same one

19         as that one.  Every time he -- this one is not

20         signed, but I'll give you that one too.

21              MR. BAKST:  We will make this Exhibit 8.

22              (Whereupon, Trustee's Exhibit Number 8 was

23         marked for identification.)

24              THE WITNESS:  February 27, 2007.  Is that the

25         one I gave you?  This is about the trustee so this

1     must be -- this is we tried to settle the thing

2     while it was actually up in the Eleventh Circuit.

3     We were trying to find ways.  I was trying to

4     preserve the options so I have that.  That has my

5     name on it.

6          MR. BAKST:  We will make this Exhibit 9.

7          (Whereupon, Trustee's Exhibit Number 9 was

8     marked for identification.)

9          THE WITNESS:  Here is the stipulation of

10    settlement with -- these are all four state cases.

11    And, by the way, this has the clause, paragraph

12    four, the confidentiality settlement agreement,

13    blah, blah.  Judge Cox signed this one also.

14          I'm trying to show Mr. Goodman that I'm not

15    being recalcitrant when I say, you know, will you

16    give us a confidentiality because I'll be in

17    violation of that which I signed.  I have the one

18    signed by Judge Cox, but that's signed by all of

19    the lawyers.

20          MR. GOODMAN:  I just want the record to

21    reflect that I have not been passed any documents

22    that have been produced today.

23          MR. BAKST:  This will be Exhibit 10.

24          (Whereupon, Trustee's Exhibit Number 10 was

25    marked for identification.)

1            THE WITNESS:  My name is on this one which I

2       gave you before.  This was the one that was going

3       back and forth with me, Harald and Goldstein, and

4       these are all David Goldstein's handwritten changes

5       to the contract.  This goes back to February 3,

6       '09.

7            The reason I can see that is I see it  was

8       faxed back and forth with Aldo and the top

9       telephone fax is mine.  The bottom one is

10      Aldo's.

11           MR. BAKST:  We will make this Exhibit 11.

12           (Whereupon, Trustee's Exhibit Number 11 was

13      marked for identification.)

14           THE WITNESS:  I think that's it.  You don't

15      want the Code Enforcement stuff yet.  You are

16      coming with that one.

17 BY MR. BAKST:

18      Q    Let me ask you on request Number 6 primarily

19 deals with vehicles.

20      A    Yes.

21      Q    Do you have anything responsive to that?

22      A    No.  I have no -- the last car I owned was a

23 Lexus.  It was either in '6 or '7.  I think it was in

24 '07.  So it might have been '08.  Let's see.  It was

25 after the -- I got rid of it after we went into the

1    Ghahan thing so that was October of '08.  So I think it

2    was the end of '08 or the beginning of '09 was the last

3    car I owned.

4            Q.    It was a Lexus?

5            A.    Yes.

6            Q.    What happened to that car?

7            A.    I turned it back in.  I think I owed two

8    thousand on it.  After I turned it in, they sent me a

9    bill for two thousand which I never paid for the extra

10   mileage.

11           Q.    It was a lease?

12           A.    Yes.

13           Q.    After that point in time, have you driven any

14   cars?

15           A.    I drive a car owned by Palm Steak House or

16   Suzanne.  I don't know whether it was titled to Suzanne

17   or Palm Steak House.

18           Q.    What car did you drive?

19           A.    I drive a 2009 Mercedes.

20           Q.    What model?

21           A.    550 SL.

22           Q.    Is that what you still drive?

23           A.    Yes.

24           Q.    Do you know who owns that car?

25           A.    Suzanne owns that.

```
 1          Q       Is there debt on that car or is that free and
 2   clear?
 3          A       I believe that's free and clear.
 4          Q       How long have you been driving this car?
 5          A       About a year and a half.  I think that was
 6   bought when I came home, but after the sale.  I think it
 7   was after the sale, but I'm sure it's on the
 8   registration.
 9          Q       I'm sorry, after the sale is when you started
10   driving it or when it was bought?
11          A       I think that's when it was bought.  Just
12   before or just after the sale.  I think it was four years
13   old when I bought it so '09, '10, '11, yeah.
14          Q       Is there a reason why the car that you are
15   driving was purchased under Suzanne's name as opposed to
16   yours?
17          A       I don't have any money.  I never have.  I
18   haven't had any money -- I can't tell you the last time.
19   Back in maybe the 1990s, maybe back in 1980s when I went
20   to prison.  The only thing I had when I came home and I
21   was gone twenty-two years, when I came home in 2000 --
22   1995.  No.  When did I buy the Lexus?  I bought the Lexus
23   in 2006 or '7.  That's the only thing that I actually
24   owned except for R-A-K, the RAK Ceramics company.  They
25   did give me a small piece of that.
```

1            I was working on that for a couple of years

2   when I first came home, first two or three years, until

3   the bottom fell out of the economy, and we couldn't sell

4   any more tile.  I don't have any money.

5        Q    Are there pending criminal proceedings now

6   against you?

7        A    No.  I got found not guilty.  I am on parole

8   from years ago.  I have eight more months left, and then

9   I'm off.

10       Q    Nothing pending now?  There are no charges or

11  violations of parole or anything like that?

12       A    Nothing, nothing, no, absolutely nothing.  I

13  have been clean for nine years.  I'm home on supervision.

14  I have been clean as a whistle.  They did arrest me.  The

15  jury threw it out in twenty minutes.

16       Q    Do you have anything responsive to number

17  seven as far as financial statements, credit

18  applications, things of that nature?

19       A    I did a credit application when I bought the

20  Lexus in '06 or '07.

21       Q    Anything other than that, that may exist?

22       A    I'm sure I had credit cards.  So, you know,

23  I'm sure I put in credit card applications.

24       Q    Do you have anything with you today

25  responsive to number seven?

1        A        No.

2        Q        How about number eight?

3        A        Declaration for motor vehicle insurance.  The

4    only motor vehicle insurance is Suzanne has GEICO and she

5    has my name on there as a driver.  Do you want that?

6        Q        Do you have it with you today?

7        A        No, I don't.  I put all of the minor things

8    until last.  I tried to get you the major things.

9        Q        How about number nine, anything responsive to

10   that?

11       A        I don't know.  I would imagine that my home

12   is on the insurance with Citizens for the town house.

13   I'm guessing because Suzanne places the insurance, but

14   I'm sure they want to know because I'm on the deed,

15   right.

16       Q        Are there any riders to that insurance

17   covering things like jewelry, art work, any things of

18   that nature?

19       A        Not that I know of, no.

20       Q        You would have a copy somewhere?

21       A        Yes, we have the -- I'll get you the policy.

22   You want the GEICO car, policy with the Citizens.

23                MR. BAKST:  Let's take a break.

24                (Whereupon, a short recess was taken.)

25                MR. BAKST:  Back on the record.

1    BY MR. BAKST:

2         Q      We left off on nine.  So number ten, do you

3    have anything responsive to that?  It generally relates

4    to boats or airplanes.

5         A      Number ten, boats and airplanes, no.

6         Q      Have you ever owned a boat or airplane?

7         A      In 19 -- in the '70s, I owned boats.

8         Q      What happened to them?

9         A      I don't know.  They were all sold.  I went to

10   jail in 1980 and didn't come home until 1995.  Actually,

11   2005.  I was only home a year in between.  So it's all

12   gone.  That's what I mean.  Since that, since I came

13   home, I don't own anything.

14        Q      Anything responsive to number eleven?

15        A      Shareholder agreements.  Well, there is no

16   shareholder agreement.  There is no membership

17   agreements.  You mean like operating agreements?

18        Q      Something like that, yes.

19        A      None that I know of.  Partnership agreements,

20   buy-sell agreements, there is a lot of with Harald.  I

21   gave you most of them.  There is some with Jeff George's

22   lawyer.  I may have one of them with me, but that went

23   back and forth too.  So we do have some of those, but do

24   you want those now?

25                    This is the -- this is the foreclosure action

1  that Mr. Goodman was talking about yesterday.  Let's put

2  that on the side until you are ready to talk about that.

3  These I need back.

4          This is the deal that we made with Jeff

5  George's lawyer, John George, the father.  This is the

6  promissory note, settlement agreement for the 28th of

7  May.

8      Q     What year?

9      A     2010.  I forget who this is with.  Actually,

10  Palm Steak House, Dude, Congress Plaza, Congress

11  Management, I know I'm on here, Thomas R. Farese.  Yeah.

12  So you have that one.  You have the promissory note, the

13  one for fifty thousand.

14          MR. GOODMAN:  These are documents that I have

15          been requesting forever.  I have never seen them as

16          far as I know so I'm just asking the trustee's

17          attorney to please make sure that they are marked

18          so one day I can review them.

19          THE WITNESS:  Just in response because of

20          the caustic remark you made, these are documents

21          that I told you, you could have any time you

22          wanted them and I gave you the case numbers and

23          everything else to show you where they were

24          filed.  But apparently you didn't want to pay

25          attention to me.  You thought I was giving you some

1       malarkey.

2   BY MR. BAKST:

3       Q      These are all documents relating to

4   Mr. George?

5       A      This one looks like Harald is involved.

6   Harald is involved in this one.  Here is the note where

7   we took the note.

8       Q      You seem to have all these in one envelope.

9   Let me try to keep them all together as one group.  They

10  are related; right?

11      A      Yes.  You have an appraisal in here that goes

12  back to 2007, and you have the Flagler Bank deed here.

13  They are all in one.  I forget who I got those from.  I

14  just got them last week.

15          MR. BAKST:  I'm going to make this -- we will

16      put it back in the envelope and make it Composite

17      12.

18          (Whereupon, Trustee's Exhibit Number 12 was

19      marked for identification.)

20  BY MR. BAKST:

21      Q      Let me see what this is.  Assignment of note

22  and mortgage and other loan documents between Congress

23  Management, LLC --

24      A      That's Harald's company.  By the way, I see

25  Ken Scherer.

1     Q     -- and Congress Plaza, LLC.  Ken Scherer is
2  an attorney at this firm.
3     A     Yes.  He looks good.  I remember Ken.
4     Q     From what I can tell, litigation with
5  Mr. Scherer was over years ago.
6     A     Yes.
7     Q     I don't think it has anything to do with your
8  case from what I can tell.
9     A     He was a major defendant, but I have no
10  problem with that.
11     Q     That was Mr. Dude in the case you filed in --
12     A     In the RICO case.  I sued Ken's firm as well,
13  but the guy is fine.  There was nothing personal about
14  any of this stuff.
15     Q     This is a loan, two point three million,
16  Congress Management to Congress Plaza?
17     A     Congress Management, is that the assignment?
18     Q     Yes.
19     A     That's when we took the assignment from --
20  don't mistake my words when I say we.  When I say we, I'm
21  talking about Suzanne, David, Barry trying to settle the
22  whole thing.  That's when -- because he had already sold
23  the place to George.  Is that in there, the sale to
24  George?
25     Q     This assignment document I see it attaches a

1   promissory note from January 2010.

2        A       January 2010, who does that go to?

3        Q       From Jeff George to Congress Shopping

4   Center.

5        A       Harald sold Congress Shopping Center to Jeff

6   George.

7        Q       I see a copy of an appraisal from '07 for

8   four million six hundred seventy-five thousand dollars

9   for Congress Avenue Retail Plaza?

10       A       That's for the whole shopping center.  You

11  know what, that came from the accountant so he probably

12  had all of that as a reference.

13       Q       Property tax reminder notice for Congress

14  Shopping Center, Ltd.  This looks like copies, they look

15  like scanned copies, of a letter from October '07 which

16  again looks to be the same appraisal, a few of the pages

17  from that.

18       A       I think he just had that in there probably

19  for his depreciation schedule or something you know.

20       Q       There is the first mortgage of one point

21  three million to Flagler Bank?

22       A       Flagler had the original mortgage on there

23  since 2001, was it, or something like that.

24       Q       Here is a promissory note payable to Congress

25  Management, LLC for two point three one million.

1        A      Is that the one I guaranteed?

2        Q      Yes.

3        A      Okay.  Just for your knowledge, because it

4   came up yesterday, I think Mr. Goodman was showing

5   Barry -- of course Barry doesn't have any idea what the

6   hell because I did all of this with Harald and Aldo.

7   They only approved it.  He didn't remember.

8              I guaranteed that note so when we filed the

9   foreclosure action, that is the reason probably Aldo

10  put my name in it saying he owns Congress Plaza and

11  Farese owned the note, however he worded it, because

12  I guaranteed it.  And I was responsible for all of

13  that.

14             But did I own it, no, I never owned the note.

15  If I owned the note, it would have been different.  I

16  would have gone to court right away.

17       Q      You signed at that time on behalf of Congress

18  Plaza, LLC?

19       A      As the agent or rep or manager.

20       Q      What was your position?

21       A      I was a consultant, but it says in there in

22  the consultancy I never did anything without asking

23  Suzanne, David or Barry, the appropriate person or most

24  times all three of them.

25       Q      Why would you individually guaranty this at

1    that time if I think your position was --

2        A      That's a question you need to sit down with

3    Harald and ask him.  I don't know why.  He wouldn't

4    come to the table unless I came and I said -- I think it

5    was some kind of mental satisfaction he got.  I don't

6    know.

7        Q    If you didn't own Congress Plaza at that

8    time, why not have Suzanne guaranty it as opposed to

9    you?

10       A    I'm telling you he didn't want Suzanne.  We

11   tried to do that.  If you will take Harald and Aldo's

12   deposition and ask them, I think it was some kind of --

13   the guy until today he calls me up, oh, let's go to

14   dinner, everything that happened all of those years is

15   nothing.  I don't know.  I don't have the answer.

16       Q    I understand that Harald Dude asked for it?

17       A    He demanded it.  He didn't ask for it.

18       Q    If you are not an owner, why would you

19   agree?

20       A    I agreed because it's my wife's property at

21   stake.  I agreed to all of that.  As far as I'm

22   concerned, she put over a hundred and fifty thousand

23   up in 1995 for this property.  Of course I'll sign for

24   her.

25                As long as we accomplished the goal and

1    stopped the litigation, sure I'll sign.  It's for my
2    wife.
3              I guess the guy to ask would be Ken Scherer.
4    He would probably have that answer.  He represented
5    Harald through all this stuff.
6        Q    In 2010, he was involved in representing
7    Harald?
8        A    No, not in 2010.  I take that back if you are
9    asking that.  I should have clarified not in 2010.  His
10   representation probably ended as far as I know in --
11   sometime in '05 or '06.  His representation ended before
12   the trial.
13       Q    There is a note from Aldo Beltrano or payable
14   to Aldo Beltrano?
15       A    Fifty thousand.
16       Q    Right.  And that's from again Congress Plaza
17   and yourself?
18       A    Right.  And that was as part of the
19   settlement with Harald, we had to agree to pay his
20   lawyer's fees.  And that's how much he was owed over the
21   years because Aldo was on the RICO trial and everything
22   else with him.
23       Q    Congress Plaza --
24       A    If you have the settlement there, that's in
25   the settlement.

1      Q      John George and Corvinia, C-o-r-v-i-n-i-a,

2  LLC --

3      A      Corvinia is John George's company.

4      Q      -- were owed money of four hundred thousand

5  under a promissory note?

6      A      Right.

7      Q      Is that part of that settlement?

8      A      Yes.

9      Q      A settlement agreement including sale and

10  purchase of note and mortgage from May of 2010.  This is

11  between yourself, Palm Steak House, LLC, Harald Dude,

12  Congress Plaza, LLC and Congress Management, LLC.  Was

13  this the settlement agreement that you believe explains

14  why these other agreements were entered into?

15      A      Who signed that one?  Did Harald sign that or

16  John George sign it?

17      Q      Harald signed it, you signed it.

18      A      That's the one -- that has to be the one that

19  Harald actually lived up to.  I thought it was in June

20  though for some reason.  There was one in May.  When did

21  we take the assignment for the two point three million

22  mortgage?  I think that came first because we used that

23  as a wedge to make the Georges settle with us because we

24  didn't want to get dragged through his stuff with the

25  government.

1      Q      The assignment is May 28, 2010.

2      A      That came first I believe.

3      Q      That's the same date?

4      A      Okay.  It was probably with George we settled

5  in June, huh?  We settled with Harald first and then

6  George.

7      Q      Is that part of this package?

8      A      Look at the date on the four hundred

9  thousand.

10     Q      That's July of 2010.

11     A      That's what it is then.  We got the

12  assignment from Harald for the two point three.  We gave

13  him some of the rent money.  That brought him to the

14  table.  Because we were behind in the rent about sixty

15  thousand or maybe more.

16            And then we used that as a -- since we then

17  had the rights to do the -- to foreclose, we filed the

18  foreclosure action to bring George to the table.

19     Q      Looking through these documents, it appears

20  there is a settlement in May of 2010, and I have also

21  seen on the statement of financial affairs an amendment

22  that you filed there is -- it's unclear whether you are

23  saying in '09 or 2010 that you transferred an interest in

24  Congress Plaza.

25     A      That was in the beginning -- actually, the

1  first time I think to the members I believe it was in the

2  beginning of '09, right after we did the February 2 I'm

3  going to call it attempts to settle.

4           And then we assigned the agreement, the

5  agreement, one of the settlement agreements -- oh, we

6  assigned the settlement agreement in November.  That was

7  assigned in November, and you got the lawsuit I think it

8  says that, right, the lawsuit that Gache filed.  Doesn't

9  it say that?

10      Q    When you say doesn't it, are you referring to

11  this settlement agreement?

12      A    The settlement agreement that we signed in

13  November 30th that never closed because that's the one

14  Harald got up at the table at Mark Goldstein's office,

15  the -- what do you call the guy that closes, the

16  lawyer?

17      Q    Closing agent?  I don't know.

18      A    Yeah, the closing agent.  He was the lawyer.

19  He handled the title, and he was doing the closing.  Dude

20  got up and walked out, and Ron Gache filed a lawsuit a

21  week later.

22           And I remember specifically Ron telling me we

23  got to file on behalf -- we have to use your name and

24  Congress Plaza.  Make sure you do the assignment as it

25  says in the thing, and I did the assignment.  It's in

1    his -- he said that in his lawsuit.

2              And so the second assignment of the agreement

3    was in November, November, maybe December 1.  It was

4    between November 30 and whenever he filed that lawsuit

5    which is December.  You have it here somewhere.

6    Mr. Goodman has it.

7              MR. GOODMAN:  Let me just jump in right

8         now.  That May 28 settlement agreement, I checked

9         my records again, I don't have it.  Are you

10        planning on arguing to Judge Kimball on August 8

11        that I'm not entitled to see that document, sir?

12        I need an answer right now because I need to

13        review it.

14             THE WITNESS:  Why do you have to do this

15        right in the middle of this?

16             MR. GOODMAN:  Because I want to be kept up to

17        speed in this case.

18             THE WITNESS:  Here is what I plan -- is that

19        what you are asking me?  I have to pay for all of

20        these pages here.

21             MR. GOODMAN:  I want to show this portion of

22        the transcript to Judge Kimball because I think

23        it's an abuse.

24             MR. GIRARDI:  You can proffer what happened

25        as an officer of the court to Judge Kimball.

1          MR. GOODMAN:  I may want this transcribed and

2      show it to the Court.

3          THE WITNESS:  All of these things were

4      offered to you before.  You did nothing but argue

5      with me.  You didn't want to hear it so you went to

6      Barry.  The guy is dying.  He's sick.  You went to

7      David.  You didn't care where he was.

8          MR. GOODMAN:  I'm sorry, Barry is dying and

9      sick, Barry Roderman?

10          THE WITNESS:  Roderman thank God he's walking

11      around after the surgery he just had.

12          MR. BAKST:  There is no way she can

13      transcribe this.  Wait, wait.

14          THE WITNESS:  I apologize.

15          MR. BAKST:  Gentlemen, at this point in time,

16      I guess there is not really a pending question that

17      I'm aware of other than at least right now my

18      understanding is your position is that until Judge

19      Kimball rules, you don't want any documents turned

20      over to Mr. Goodman.

21          THE WITNESS:  Unless he gives a

22      confidentiality.

23          MR. GOODMAN:  Just so it's clear -- I'm

24      trying to put my brain to words.  That is --

25          THE WITNESS:  Which --

1          MR. BAKST:  Let him finish.

2          MR. GOODMAN:  That is a critical document.  I

3     would like to sit here and review it right now.  I

4     have never seen it before.  Because as I understand

5     the testimony, that is the agreement that was

6     performed.  And, again, if I may indulge, who are

7     the parties to that agreement and what is the date

8     so it's completely read into the record?

9          THE WITNESS:  I asked you before.  Are you

10     going to say that it will be held in confidence and

11     only be distributed amongst your own helpers and

12     assistants and secretaries?

13          MR. GOODMAN:  And useable in this case.

14          THE WITNESS:  If you make that statement

15     on the record, that's fine with me.  You can see

16     it.

17          MR. GOODMAN:  Again, I do not make it a

18     policy --

19          THE WITNESS:  Then, I'm sorry.

20          MR. GOODMAN:  -- to distribute the

21     documents.

22          MR. BAKST:  I have already read into the

23     record who the parties are.

24          THE WITNESS:  I'll give you anything you

25     want.

```
1              MR. BAKST:  The parties to the agreement are
2         yourself --
3              MR. GOODMAN:  In what capacity, Michael?
4              MR. BAKST:  Just Thomas Farese, Palm Beach
5         Steak House, LLC, Harald Dude, director and
6         authorized agent, Congress Plaza, LLC and Congress
7         Management, LLC.
8              MR. GOODMAN:  What is the title of the
9         document?
10             MR. BAKST:  Settlement agreement including
11        sale and purchase of note and mortgage.  This is
12        May of 2010.
13   BY MR. BAKST:
14        Q    You were telling me an about an agreement
15   from November or December.  Was that of 2010 or was that
16   before this?
17        A    Before that.  That was '09, November 30 of
18   '09.
19        Q    That's something I think you said wasn't
20   actually signed or wasn't consummated?
21        A    It was all signed and consummated.  We gave
22   them money and everything.  We gave them rent money.
23        Q    That's a separate agreement between the same
24   parties?
25        A    Yes, but it never closed, and we had to go to
```

1    court on it.  That's what this settlement is about.  I

2    mean I don't want to keep at it with Mr. Goodman here.  I

3    want to get along with the guy.

4              MR. GOODMAN:  What is the exhibit number so

5         we can mark that, Michael?

6              MR. BAKST:  It's all going to be part of

7         Composite 12.

8              THE WITNESS:  Mr. Goodman, you are going to

9         get all of this stuff.  I just want you to be a

10        gentleman.  You get more with honey.  Be nice.  You

11        can have anything you want.

12             MR. GOODMAN:  Tommy, I always try to be nice

13        as I go through life.

14             THE WITNESS:  You had four lawyers that you

15        were chomping at the bit to go after, and they were

16        calling me, what does this guy want.

17             MR. GOODMAN:  We are in good faith

18        investigating fraudulent transfers.

19             THE WITNESS:  Nothing fraudulent been done

20        here whatsoever.  None whatsoever.  My wife put the

21        money up for this property in 1995.

22             MR. GOODMAN:  I haven't seen that document.

23        You haven't shown it to me.

24             MR. GIRARDI:  Please.

25             MR. BAKST:  One at a time.

1          THE WITNESS:  Well, my wife told me before I

2     left today, don't let Goodman aggravate you.  So in

3     the name of the Father, Son, Holy Ghost, you are

4     not going to aggravate me.

5          MR. GOODMAN:  I'm not intending to aggravate

6     you, sir.

7          THE WITNESS:  I'm looking for the settlement

8     of that case.  He should have that too.  Did I give

9     you that?  I don't have it.  I did have it.  You

10    must have it in there already.  Anyway, I'll get it

11    for you.  It's only one document.  It's the one

12    with all of the four cases on the front page.  You

13    must have put it in, Mr. Bakst.

14          But that one we -- but that was signed,

15    sealed and delivered.  We set a closing date, a

16    quick closing, okay.

17  BY MR. BAKST:

18     Q     But it didn't close?

19     A     It didn't close because Harald walked out.

20  It was something over more money that he demanded at the

21  last minute.  So he walked out.

22          Two weeks later he sells the property to Jeff

23  George in January as you just -- I don't know how you

24  found the date, but you found it.  Two weeks later he

25  sold the property, but we still went to court.

1           Ron filed in court on my behalf and -- as a

2    matter of fact, I didn't sign the complaint.  Ron Gache

3    signed my name to the complaint.  But I know he put it in

4    there that said as stated in the -- as stated in the

5    agreement, Mr. Farese assigned to Congress Plaza.  That's

6    right in the thing.

7           So we will have to get Ron's deposition to

8    find out what he did and what he -- because he was well

9    aware of the fact that I owned nothing, and they all

10   knew.  They thought Harald was nuts, why is he making you

11   sign this.  I don't know, but I'm going to sign it.

12      Q     Whatever this other agreement is, you don't

13   have here today but you think you can locate it

14   somewhere?

15      A     You have got it.  Mr. Goodman produced it

16   yesterday, didn't you?

17           MR. GOODMAN:  I'm sorry, what?

18           THE WITNESS:  Didn't you produce it

19        yesterday, that November agreement?  You put it

20        in the state court in the proceedings

21        supplemental.

22           MR. GOODMAN:  The specific performance

23        complaint with attached documents.

24           THE WITNESS:  And the agreement should be

25        attached.

1      MR. GOODMAN:  Let's see.  I think you may be
2   correct.
3          THE WITNESS:  Wow, okay.
4          MR. GOODMAN:  Let me show you.
5          MR. BAKST:  Okay.
6          MR. GOODMAN:  I just have the complaint.  I
7   don't have the agreement attached.
8          THE WITNESS:  Could I see the complaint and
9   I'll point out to him what I'm talking about.
10         MR. GOODMAN:  The exhibits may have been left
11   off of that copy.
12         THE WITNESS:  Okay.  Here is -- okay.
13   Please, Mr. Bakst, read paragraph twelve.
14         MR. BAKST:  Okay.
15         THE WITNESS:  And that is signed by Ron
16   Gache, and he signed my name.  That's not my
17   signature.  Ron Gache signed it.  He wanted to get
18   it filed immediately because --
19         MR. GOODMAN:  Exhibits were not attached to
20   this because it would have created bulk.
21         THE WITNESS:  I'll get you that.  I thought I
22   had that.
23   BY MR. BAKST:
24      Q    If you can locate that, but looking at this
25   document, you wanted me to read paragraph twelve?

1    A    Yes.  You were asking me about the date when

2    we signed the agreement or whatever.

3    Q    Lawsuit of Congress Plaza, LLC, Circuit Court

4    here in Palm Beach County, an '09 case, CA040940.  It's

5    versus Congress Shopping Center, Limited and Title One of

6    Florida.  Paragraph twelve says, shortly after Mr. Farese

7    executed the agreement and as contemplated thereunder, he

8    assigned all of his rights, title and interest as buyer

9    under the agreement to CC, those are two letters, the

10   buyer.  CC is defined as Congress Plaza, LLC, further

11   known as Congress Center, LLC.  At least here they don't

12   say attached hereto is --

13   A    He had to with the complaint, no?

14   Q    There is other -- and the preceding

15   paragraphs there is a reference to copy of some agreement

16   as Exhibit A.

17   A    That was the only agreement at that time

18   except for the one that is unsigned that I showed you

19   that David made his notations on.

20   Q    This refers to a November 21, '09 agreement

21   of yourself and your assigns as buyer and CSC defined as

22   Congress Shopping Center, Ltd. as seller entering into an

23   agreement for purchase and sale and settlement of all

24   claims.  This says you agree to purchase and CSC agreed

25   to sell, when I say you, it's you and/or your assigns,

1  for a price of four point five million dollars certain

2  real property.  It references 964 through 1012 North

3  Congress Avenue in West Palm Beach.

4             Is it that agreement that you are referring

5  to?

6       A    Yes, sir, it is.

7       Q    I guess you will be able to find this.  I

8  guess let your attorney know.  And I'll look at that.

9  And the purpose of that agreement other than obviously

10 what it says there, do you think there is somewhere in

11 there in that agreement that you assigned certain

12 rights because paragraph twelve which I read says shortly

13 after Mr. Farese executed the agreement and as

14 contemplated thereunder, he assigned all of his rights,

15 title and interest as buyer under the agreement to CC,

16 the buyer?

17      A    It's referenced in there that it's me and my

18 assigns or my assigns that was entering.  That's when

19 this whole thing came up about -- I remember like

20 yesterday in Beltrano's office -- why do you want my

21 name, what are you doing.  This is when Harald said, you

22 want to settle with me, then you must sign.  Okay.

23      Q    When you entered into the agreement in

24 November of 2009, were you the owner at that time of

25 Congress Plaza, LLC?

1      A      I believe at that time I was the manager but

2   not the owner.  There was no owner actually.  There was a

3   period of about four or five months when there were no

4   members.

5      Q      How did that happen?

6      A      Because I resigned.  We are going to get to

7   the sunbiz documents.  It shows it right there that I was

8   taken off as a manager.  So as a matter of fact -- as a

9   member rather.  There was no member.  Even when it was

10   formed, there was no member.

11           And it was me as the initial manager, but

12   there was no initial member.  And there never was until

13   we started in -- it was either '06 or '07 when I wanted

14   to change the name to Congress Center, at that time I

15   didn't know what the hell I was doing with sunbiz, and I

16   put down that I'm the managing member.

17           Mike didn't want anything else to do with the

18   thing because he sold his marina.  So it has no assets.

19   It has no liabilities.  So I said let's use it for

20   Congress Center.  Why spend another two or three hundred

21   to have another company made.

22      Q      During this time, there were no members of

23   Congress Plaza in November of '09; correct so far?

24      A      I have to read the documents to be sure what

25   the dates are.  I know that in -- I know that in June of

1    '010 Suzanne at the next -- whenever the next annual

2    report had to be filed, Suzanne and David and Barry were

3    on, and I stayed on as a manager.

4              The one before that, I believe I was a

5    manager.  The one before that, there was a name change

6    too.  There were two name changes, one to Congress Center

7    and then to Congress Plaza.  And without actually seeing

8    the annual reports in front of me, I can't tell you.

9              The assignments of the agreements when I dig

10   that out, that will show when I assigned the agreement.

11   But I say when we examine all of the documents together,

12   and this is my fault because I didn't bring them all

13   today, I apologize, but when we assign everything

14   together -- are you submitting that in evidence?

15             MR. GOODMAN:  It's the history of Congress

16        Plaza.

17             THE WITNESS:  Maybe I can point out what I'm

18        talking about.

19   BY MR. BAKST:

20        Q    This is April of '09 for Congress Center, LLC

21   which is what became Congress Plaza?

22        A    Yes.

23        Q    The change was managing member was yourself,

24   and then the change was looks like it changed --

25        A    That's probably when I came off.  That's when

1    I came off probably.  What is the date of that?

2         Q      This is April '09.

3         A      Right.  That's when I came off.

4         Q      It doesn't remove you.

5         A      Okay.  I'll show you how you prove that.

6    When you look at the next annual report, my name doesn't

7    appear anymore, only as a manager.  That's why that

8    little box is checked where it says change.

9         Q      It says change, but it doesn't say what the

10   change is.  What is attached is --

11        A      I only became manager.  There is nothing

12   attached.

13        Q      It says managing member.  It has the

14   abbreviation for managing member.  What is attached to

15   that is --

16        A      I was a managing member when that was done.

17              MR. GOODMAN:  It's not attached.  It's

18        actually the next filed document.

19   BY MR. BAKST:

20        Q      The next filed document is the name change to

21   Congress Plaza.

22        A      Who signed it?

23        Q      You signed it.

24        A      As?

25        Q      Signature of a member or authorized

1    representative of a member.

2         A      There you go.

3         Q      And then in June of 2010, then there is

4    something that lists you just as manager.

5         A      Right.  There you go.  The sequence is there.

6    That's exactly what happened.  And that's when Suzanne

7    and David and Barry came on, in June.

8         Q      No.  I don't see any members listed until

9    April 2012 when you are listed as manager, Suzanne is

10   managing member, and then Mr. Roderman and

11   Mr. Goldstein --

12        A      Do you have '10 there?

13        Q      Sure.  They are then members.

14              MR. GOODMAN:  You missed one year, 2011.

15        February of 2011 is when Mr. Farese is shown as

16        manager and manager members are shown as Suzanne

17        Farese, Barry Roderman, and David Goldstein.

18        That's the first time I see a change of membership

19        in the corporate records.

20              THE WITNESS:  This sunbiz records as we

21        proved in the case with Harald and everybody,

22        sunbiz records are not certified qualified records.

23        I guess you can use them to show things, but it's

24        not -- what's the word I want?

25              MR. BAKST:  Self-authenticating?

1          THE WITNESS:  Yes.  I think that's it, yes.

2     But in any event, you see in April because we

3     entered the agreement -- Dude sold the place to

4     George in January.  We did the assignment after

5     November 21.  I thought it was November 30.  We did

6     the assignment.  They came off.  I came off as the

7     manager.  I mean I came off by my resignation.  But

8     in the sunbiz, I marked change.  And I -- if you

9     look, I signed it also as managing member when I

10    filed it April 23rd, and I changed.  And then the

11    next one is -- what is the date on this one?  Oh,

12    November 30.  I gave this November 30, and I signed

13    as authorized representative of a member.  And if

14    you look under managing members, this is June 14 of

15    2010, there is nothing there because that was the

16    period when nobody was the member.

17         Now even though I may have assigned it

18    already, and I assigned the agreement and I

19    assigned it to them, nobody did -- because nobody

20    told me to file.  Tommy, file this.  Because I took

21    care of all of this stuff.

22 BY MR. BAKST:

23    Q     You say nobody told you.  Who would tell

24 you?

25    A     Suzanne, David, Barry.  Have you got this

1  up to date, are you doing that.  They would tell me.

2  They relied on me for all of this stuff, and I did it

3  all.

4         MR. GOODMAN:  He just mentioned an

5      assignment.  I don't know if it's been determined

6      if that was in writing or oral and when.

7  BY MR. BAKST:

8      Q    What assignment were you referring to?

9      A    I know that the -- I was referring to the

10 assignment when I gave it, when I said to Barry, David,

11 and Suzanne, take Congress Center.  That's what I started

12 using with this when I started with Harald.  Make that

13 the owner of the property.  And I -- you guys take it and

14 split that up.  And the next time whenever we file, we

15 will reflect all of that.  Okay.

16         Has it got any bills, no.  Does it own

17 anything, is it clean, yes, it's clean.  The only person

18 that ever was on this was Mike Carey.  So that's what I'm

19 talking about.

20         Then when we actually used it for the --

21 when I assigned the -- that last agreement, the

22 November agreement, when I actually assigned the

23 November agreement to Congress Plaza, that's when I

24 started changing the rest of the things in sunbiz as it

25 came up.

1          So this would be -- there are some years
2     skipped in here.  But June 14, 2010, yeah, because it was
3     November we did the thing.  We did the one that fell
4     through.  In May, we did the -- you know, so this falls
5     right in line.  That's when I filed just as manager.  I
6     took myself off because since we started using that, when
7     I assigned everything to them and using that, then I'm no
8     longer a member.  I have no interest whatsoever except as
9     manager.  So I took myself off, and that's where it's
10    reflected in the very next report.
11         And then where you see where I signed
12    November 30, that's when I must have done it because you
13    see I didn't sign as managing member which I usually did.
14    If you look at all of the rest of them, like the one here
15    4/23/09, I signed as managing member because I was the
16    managing member when I made the change.
17         But when I wasn't the managing member, you
18    know months later, I didn't sign as managing member.  So
19    you look what I put next to my name because that tells a
20    story I guess.  But whatever I have when I come here the
21    next time, you will have it all.
22         Q    Is it okay if we mark this?
23         A    Yes.  Would you please note on the record
24    that I'm going to get all of the annual reports
25    including -- annual reports.  Let's see what I have here.

1    May I give these to you?

2              MR. BAKST:  Sure.  This is 13 what we just

3         talked about.

4              (Whereupon, Trustee's Exhibit Number 13 was

5         marked for identification.)

6    BY MR. BAKST:

7         Q     You are going to show me some other

8    documents?

9         A     Here is the original form, filing form.

10   Mark Goldstein signed it as the authorized

11   representative, and he's an attorney who formed this.

12   And I am the manager.  I am the initial manager which is

13   Article 4.

14              And then here is '06.  I am still the manager

15   in '06.  And then there was a change.  I did it the same

16   way.  Change to Florida Marine Yacht Club.  That's '06.

17        Q     Were you the sole managing member when it was

18   initially formed?

19        A     I wasn't a managing member.  I was not a

20   managing member.

21        Q     Who was the member?

22        A     I guess it was Mike because Mike is the one

23   that told me to form them.

24        Q     Mike who?

25        A     Mike Carey owned the marina.  He's also the

1    fellow that Darlene and Fred loaned three or four hundred

2    thousand to that I guaranteed, and he paid them all back.

3    And that's part of our lawsuit that I'm saying I'm

4    entitled to a commission from that.

5         Q    You are showing me something else?

6         A    Yes.  What year is that?

7         Q    This document was August of '05.

8         A    That's the next one is '06; right?  I signed

9    it as manager; right?

10         Q    Yes, sir.

11         A    But we made a change as to Florida Marine

12    Yacht; right?

13         Q    Yes, as the manager.

14         A    Right.

15         Q    Okay.

16         A    No.  As the manager, right.  Now here is the

17    next year is '07.  Florida Marine Yacht is still the

18    manager, but I became managing -- I became managing

19    member in '07; right?

20         Q    Okay.

21         A    Doesn't it say change?

22         Q    Right.  So now as of --

23         A    '08 I'm missing.  I have to get you all of

24    them.

25              MR. GOODMAN:  I have '08 online if anyone

1    wants to look.

2         THE WITNESS:  Sure.  Let's see what it says.

3    I have no idea what it says.

4         MR. GOODMAN:  It says manager member.  This

5    is '08.

6         MR. BAKST:  Okay.  Looks like it stayed the

7    same in '08.

8         THE WITNESS:  Is there a check mark next to

9    anything?

10         MR. GOODMAN:  No.  There is no change, if

11    that's what you mean.

12         THE WITNESS:  Any changes, check mark,

13    deletions, anything like that?

14         MR. GOODMAN:  No.  Do you want to see?

15         THE WITNESS:  No.  I'll take your word.  I'll

16    check it when I go home.

17         Then we changed the name from Congress

18    Center, and this is November 30 of '09.  This is

19    when we changed the name to Congress Plaza,

20    November 30, '09, which is exactly right because it

21    was November 21st that I signed the settlement deal

22    with Harald.  And a week later I must have changed

23    the name to make sure everything read Congress

24    Plaza.  That's '09.

25         I signed it not as a member, as manager.  I

1    signed it as an authorized representative, not as

2    a member.  Because I didn't put that next to my

3    name.

4         And then you see in the next one, 2009, this

5    is November 30, 2009.  Where is the annual report

6    for 2010?  Okay.  June 14 that's when I became --

7    here is '9 first so you have that one.

8         MR. BAKST:  We'll make this folder Exhibit

9    14.

10        THE WITNESS:  Okay.  That goes with the name

11   change.

12        MR. BAKST:  Okay.

13        (Whereupon, Trustee's Exhibit Number 14 was

14   marked for identification.)

15        THE WITNESS:  Then November 30 of 2010, not

16   2012, not 2012, Mr. Goodman, in November 30 of

17   2010, which is the next amended, I did an amended

18   annual report because, I'm supposing now, David or

19   Barry must have said to me, did you bring

20   everything up to date.  And I checked it, and I

21   filed an amended annual report Farese is only a

22   manager and Suzanne and David and Barry came on as

23   members.  That's in November 30 of '10.

24        Remember we did the final settlement with

25   George in June or July.  We did Harald in May, the

1       one that stood up.  The one in November of '09,

2       that's the one where he got up and walked out.  The

3       one in May is the one that stood up.

4            And then we did the foreclosure action.  We

5       brought them to the table.  And we settled with

6       them for the four hundred, and the two mortgages

7       wiped each other out.  But Harald still owns a

8       mortgage on the property.

9            And here you have 2011.  There is Farese is

10      still the manager.  2012 Farese is still the

11      manager.  Here is '13.  Farese is the manager.

12      Suzanne is still the managing member.  Still the

13      same.  Here is the envelope.

14           MR. BAKST:  Okay.  We will keep this

15      together.

16           THE WITNESS:  I don't know if I'm missing

17      anything in there.  Am I missing the name change to

18      Riviera Yacht?  I'll get it.

19  BY MR. BAKST:

20      Q    It appears then there was a period of time,

21  and this is Exhibit 14, where in June of 2010, there is

22  no member listed at all with this date.

23      A    June of 2010?

24      Q    You filed something listing just you as

25  manager and it lists no members.

1      A      We didn't list anybody as a member at that

2  time.

3      Q      It had no members?

4      A      It appears that way that there were no

5  members.  I don't know whether I waited because they told

6  me to bring it up to date or --

7      Q      As of that date, had Congress Plaza or

8  whatever other name it used ever filed a tax return?

9      A      No.

10      Q      It never did business; right?

11      A      No, they never had any business.  Did I give

12  you the tax returns for Congress Plaza?

13      Q      I have bank records.  I don't believe I have

14  tax returns.

15      A      Okay.  You have to get the tax records.  I

16  meant to give you.  That came from the accountant.  He

17  should have stuck them in there too.

18      Q      It appears then, I had the deed from

19  yesterday, that Congress Plaza obtained title to real

20  property sometime in 2010; would you agree with that?

21  And I think I have the deed.

22      A      Yes.  Sometime in 2010 they did, because it

23  was either through -- because both settlements that stuck

24  were both in 2010.  Up until that time, the whole thing

25  that gave me the right to fight for it was -- that was

1   another thing why we protected the sixty-year lease was

2   because of the option to buy the shopping center.

3        Q    Do you recall who transferred the property to

4   Congress Plaza in 2010?

5        A    Congress Shopping Center did.

6        Q    That's Mr. Dude's company?

7        A    But remember he sold it to George so at the

8   time it was transferred, I believe it was George

9   because -- as a matter of fact, as of today, Brad Beilly

10  who is the attorney for John George, the father, he

11  controls Congress Shopping Center.  They are the ones

12  that gave us the deed.

13       Q    When Congress Plaza obtained the deed, which

14  I think is sometime in 2010, it appears there was no

15  members at all until later in the year when you filed

16  something with the Secretary of State?

17       A    There had to be members before that.  There

18  must have been members at the time he took the deed.

19       Q    Why do you say that?

20       A    Because I mean I'm not -- we are not going to

21  use a shell company without anybody owning it and

22  controlling it.

23       Q    Who did you think owned it?

24       A    Suzanne, David and Barry, of course.  And I

25  think the deed is dated in July.  I think Mr. Goodman

1    said that a couple hours ago.

2         Q    Then if --

3              MR. GOODMAN:  This is the '09.  It shows him

4         as managing member.

5              MR. BAKST:  2010 there is no member listed.

6    BY MR. BAKST:

7         Q    Are there any documents of this entity, of

8    Congress Plaza, other than what we have seen today and I

9    think everything that we have marked today --

10        A    There is a written assignment for sure.  I

11   think --

12        Q    You have to let me finish my question.  Is

13   there any document that outlines who the owners are?

14        A    Well, I mean when they all file their taxes,

15   they all got K-1s, they all got -- so, you know, whenever

16   the first year for the -- wait a minute.  It might be in

17   the -- that was Palm Steak House.  You know, you have to

18   file -- for the licenses, you have to file with the city,

19   the county.  You have to file who owns, who is the blah,

20   blah, blah.

21        Q    You would agree in an LLC, normally there

22   would be an operating agreement?

23        A    There were no operating agreements for any of

24   the LLCs we did because we are all -- you know, there

25   weren't any strangers involved in the LLC.

1      Q      Normally there would be a membership

2   agreement that outlines who the members are?

3      A      We never formed any.  We always went by as

4   the statute says, when there is no operating agreement or

5   membership agreement, you go by whatever the statute

6   says.

7      Q      Who do you think then would be the owners?

8      A      Suzanne, David and Barry.

9      Q      Based on what?

10     A      Based on what?  Based on Suzanne, the fact

11  that she owned it all of the time, and based on the

12  retainer agreement with David and Barry, we had to give

13  them thirty percent.

14     Q      You are referencing Florida statute.  I think

15  Florida statute would go back to whoever the members are

16  on file with the state, and then there are statutes that

17  apply.  But I don't think we have seen anything initially

18  that listed any member on this and then we saw --

19     A      You are going to see the assignments when I

20  assigned them, and I orally assigned both times.  But I

21  also put it in writing, especially that's how Gache

22  picked it up and put it in his --

23     Q      The complaint?

24     A      Yes.

25     Q      This complaint listed you as the managing

1    member of Congress Plaza.  Were you aware of that?  So

2    you were listed at that time.

3        A    What is the date of the complaint?

4        Q    Complaint was filed December of '09.

5        A    Okay.  He probably checked the sunbiz, and my

6    name was probably still listed as the managing member.  I

7    mean even regular lawyers do you sit down and do

8    everything all at once?

9        Q    This then says, the paragraph you had me

10   read, paragraph twelve, was you assigned your rights.

11   Apparently you had certain rights under the agreement

12   November of '09 and you then assigned them to Congress

13   Plaza?

14       A    Yes.

15       Q    That's something that you are going to

16   locate, whatever -- well, is there a separate document

17   where you assigned your rights to Congress Plaza?

18       A    Yes.

19       Q    If you can locate that and provide that

20   please.

21       A    I will.

22            MR. GIRARDI:  Please no whispering.

23            MR. GOODMAN:  Okay.  I'll say it out loud.

24       We still do not have the purchase and sale

25       agreement for the October 2012 transaction.

1          MR. GIRARDI:  That's fine.

2          MR. GOODMAN:  Are they here today?

3          MR. GIRARDI:  You are not asking questions at

4     today's examination.  That has been established.

5          MR. GOODMAN:  That's why I was whispering to

6     the trustee's lawyer.

7          MR. GIRARDI:  How is that permissible?

8          MR. BAKST:  He can whisper to me.  People

9     whisper.  It's not like you are whispering to your

10    client, don't answer this question or something

11    like that.  But let me move on.

12  BY MR. BAKST:

13    Q     There is a November '09 agreement that I

14  think you are referencing.  There is then some signed

15  document that you think exists where you assigned your

16  interest to Congress Plaza.  You have shown me the

17  settlement agreement from May of 2010 which is all part

18  of Composite Exhibit 12.  This references the twenty

19  thousand dollar payment that you mentioned to me and

20  there is all of these other documents.

21    A     I mean if that's referenced in there, I can

22  get those checks I'm sure.  You may already have them

23  from Mr. Goodman.  I don't know.

24    Q     At this time the Congress Plaza obtained

25  ownership of the real property and --

1        A        Which time?

2        Q        I think sometime after this agreement May

3    of --

4        A        Is that the November agreement?

5        Q        This is the May of 2010 agreement.

6        A        Yes.  I think that's when we got -- what

7    does it say there?  Isn't that the one where we got the

8    note?

9        Q        Yes.

10       A        We couldn't get the -- that's why we had to

11   file the foreclosure action against George because

12   George -- they were actually arguing who actually had the

13   title.  They were in court separately about that.  So we

14   were trying to go after them both.  We didn't care who

15   owned it, but let's settle it.

16              So I can't tell you actually -- as a matter

17   of fact, to show you how sunbiz is, they were both filing

18   documents, and I'll get you the records of that.  They

19   bought it up to Judge Cox.  I'm the owner and managing

20   member.  I want my name on there.  Then George no, no,

21   here is the form.  I'm the real managing member.  I want

22   my name on there.

23              So we are left in a position like who the

24   hell are we dealing with and how do we settle it, what do

25   we do.  That's why you see so many of these agreements

1    and everything.

2         Q    As you understand it, was the real property

3    held by Congress Plaza ever owned by you individually?

4         A    The most I ever owned on the property was an

5    option to buy the property contained in the sixty-year

6    lease.  I never owned the property whatsoever.

7         Q    Is there any agreement, any written

8    agreement, between yourself and Suzanne where you were

9    transferring back to her any interest in Congress Plaza

10   or the lease or the business including Palm Steak House

11   or any other name?

12        A    Well, the business I did it in the lease.

13   Remember I showed you the lease that says I'm

14   transferring the business.

15        Q    The one that was marked as I think it's

16   Exhibit 5 or 6?

17        A    The thirty-year lease.

18        Q    That's Exhibit 6.  And this is the document

19   that as you understand it is where you assigned your

20   interest in the business to Suzanne?

21        A    Correct.  Well, not just Suzanne.  Suzanne,

22   David and Barry.  I assigned it to Palm Beach Gentlemen's

23   Club, right.

24        Q    Palm Beach Gentlemen's Club --

25        A    Is the owner of the business.

1          Q      That became Palm Steak House?

2          A      And that became Palm Steak House, right.

3                 MR. GOODMAN:   What is the date of that

4          assignment?

5                 THE WITNESS:   That was back -- the

6          thirty-year lease was back in 2007.

7                 MR. BAKST:  April 2nd of '07.

8                 THE WITNESS:   And then on the property, I

9          did a written assignment as well for both, the

10         people -- you call them the members I guess; right?

11   BY MR. BAKST:

12         Q      If we are talking LLC, yes.

13         A      The members and the agreements and the only

14   one I can actually remember and give you a date on is the

15   one I assigned the agreement -- but I'll find them for

16   you -- is the agreement because I see what Ron said in

17   the paragraph fourteen.  He references the -- he makes

18   reference to the assignment in paragraph fourteen.

19         Q      I think it's paragraph twelve.

20         A      Maybe it was twelve.

21         Q      Just so the record will be clear.  That's the

22   assignment that you are talking about is of your interest

23   to Congress Plaza?

24         A      All my interest to Congress Plaza, yes, all

25   my interest in the dealings with Harald and Jeff, no

```
 1    matter who owned, we didn't -- I mean we really didn't
 2    know who legally owned it.  We didn't know what the hell
 3    they did to get it, and really I didn't want to know
 4    because I hate to say it, but with my background, I
 5    didn't want them to involve me in their stuff.  I wanted
 6    nothing to do with it.
 7         Q    Is there any document where you assigned your
 8    interest in Congress Plaza to Suzanne or anybody?
 9         A    Yes.  Suzanne, David and Barry.
10         Q    What document is that?
11         A    That's a regular standard assignment.  It's
12    an assignment.
13         Q    Is that here today?
14         A    No.  Neither one of them are here today.
15         Q    You have that somewhere?
16         A    I have them both, yes.
17         Q    You say both.  Which other assignment are you
18    talking about?
19         A    I signed the agreement that is a separate
20    assignment.
21         Q    The agreement referenced in the complaint?
22         A    Yes.  Because actually I did the agreement
23    referenced in the complaint because either Ron or the
24    lawyer in his office asked me, Tommy, get the assignment,
25    don't forget the assignment.  He was in such a hurry to
```

1    file that complaint.  That's why he signed my name.

2         Q    Do you recall when you signed the assignment

3    of your interest in Congress Plaza to Suzanne, Barry and

4    David?

5         A    I can't give you an exact date, but I'm going

6    to guess it had to be right after we did this when David

7    was working on this, the one that we did not -- we may

8    have signed it.  I can't find a signed agreement, but the

9    one that David was working on -- and I will ask him

10   because he's in New York right now.  His father is in the

11   hospital.  I mean he's in New Jersey.  But when he gets

12   back, I'll ask him, David, the assignment, do you have

13   it, do I have it, do I look, does your girl.

14        Q    When you mentioned the date, what year?

15        A    It had to be after February of '09.  You have

16   it.  It would have to be after.  It was either right

17   around February.  It's the agreement when you see

18   handwriting on every page, Goldstein's changes.

19        Q    You think it's '09?

20        A    Yes.  February of '09.

21        Q    In exchange for any of these assignment

22   documents you signed, either the one that may be in

23   February '09 where you transferred your interest in

24   Congress Plaza or where you assigned your interest to --

25   your own individual interest to Congress Plaza, did you

1    receive any money or any type of consideration at that

2    time?

3         A    I received consideration.  I didn't get any

4    money.  David and Barry did the trial for me.  It was a

5    three-week trial.

6         Q    The consideration was the legal work by your

7    attorneys?

8         A    Yes.

9         Q    Then if that was the case, why would Suzanne

10   receive an interest as opposed to just them?

11        A    Because she put the money up to buy the thing

12   in the first place.  We wouldn't have had anything if she

13   didn't put the money up.

14        Q    She put up a total of a hundred fifty?

15        A    About a hundred fifty.  You could probably

16   get them easier than me from Bank America where we tried

17   to get the accounts and, you know, we no longer have it,

18   maybe it's on microfiche.  You know what they do when you

19   are not a lawyer.

20        Q    You had a copy of that check.  We might as

21   well make it a exhibit.

22        A    You gave it back to me?

23        Q    I believe so.  Otherwise I'll go through

24   whatever we have here.

25        A    It's a two-page document.

```
1         Q     I think it's right there underneath all of

2    that.

3         A     Yes, that's it.

4         Q     It looks like there are two copies.

5         A     He can tell you, as a matter of fact.

6         Q     This is from '95.  It says to Ken Scherer.

7    How was he involved at that time?

8         A     He represented Harald in the purchase.  He

9    knows Suzanne put the money up.

10        Q     Actually, this is from November 2000 that you

11   were sending him a copy of a check from --

12        A     No.  Ken subpoenaed that from the bank

13   because he wanted to -- he was defending the lawsuit for

14   Harald.  But then I was still away.  But when I came home

15   in '05, he had -- he was no longer involved in the case.

16   That's when he hired Rosenbach and Beltrano.

17        Q     I'm going to give you back it looks like we

18   have multiple copies of the same thing.  I'm going to

19   mark as Exhibit 15 these two pages.

20        A     From the bank 2/10 so he got this.

21              (Whereupon, Trustee's Exhibit Number 15 was

22        marked for identification.)

23   BY MR. BAKST:

24        Q     While you are mentioning the consideration

25   was these attorneys did work for you representing you,
```

1    yesterday we deposed Mr. Roderman and he did not have a

2    copy of any retainer agreement.  Do you have a copy of

3    any retainer agreement or any contract with him or

4    Mr. Goldstein?

5         A    Absolutely.  I don't know whether he signed

6    it or David signed it, but one of them signed it.  And

7    there is correspondence going back and forth, especially

8    with David because I put David on the case before I came

9    home.  I'm going to need a lawyer.  I can't do this

10   trial.

11              So there was a retainer agreement entered

12   either -- it had to be a couple weeks before we did the

13   trial so it would be sometime in May of 2005.

14        Q    Do you have it with you today?

15        A    No, I don't, but I'll get it for you.

16        Q    Do you have any correspondence?

17        A    I don't have any correspondence about that,

18   no.  I didn't know that would be important, but I will

19   get that.

20        Q    Can you tell me as best you can recall what

21   was the agreement that you reached with them?

22        A    They get thirty percent of anything that we

23   got from the lawsuit as a result of the lawsuit and/or in

24   connection with the lawsuit in the representation.  And

25   we determined that they were entitled to the property as

1     well because I wouldn't be able to get the deal for the

2     property unless I exercised the option that was in the

3     lease.

4                 That's how it all started and that's why I

5     brought you the one that had the notes on them and

6     everything as well.  If you look in the preamble, it

7     always says whereas Farese has an option blah, blah,

8     blah.  I had to exercise it they thought within a certain

9     time.  We thought it was a later time.  But to be safe, I

10    said let's exercise the option.  Even though we don't

11    have the money to pay it, let's exercise it so we can

12    protect the option.  That's what happened.

13         Q     In exchange for them representing you in

14    that lawsuit, they received thirty percent of any

15    recovery?

16         A     Everything, right.

17         Q     I think that one or both of them may have

18    also represented you in criminal proceedings; is that

19    correct?

20         A     Barry did, but that's years ago.  He's going

21    back to -- I know Barry since he's twenty-six.  I knew

22    his uncle and everything else.  He's going back to -- I

23    can't remember.  He's going back to the '70s.

24         Q     Then are there any other agreements that you

25    have for him?

1       A       With David?

2       Q       David.

3       A       Or Barry?

4       Q       Or Barry to represent you in any matters

5    since then.

6       A       David has represented Suzanne in some stuff.

7    I mean, you know, when you need a lawyer or you need a

8    lawyer involved, you know, you call Barry, Barry, do me a

9    favor.  It's like because he's -- I have known him so

10   many years.  I'm sure you have clients that do that,

11   Mike, I have a problem, will you make this call for me or

12   something.

13      Q       I understand that there is the --

14      A       The only one that we actually signed -- years

15   ago when I had the shipping company back in the '70s, we

16   had retainer agreements with Barry, absolutely.  But that

17   was more business, you know.

18      Q       I haven't even gone through the schedules

19   with you today.  That's something we will do next time.

20   We haven't even gone through the document list.  But I

21   think it was Ghahan or some similar name?

22      A       Ghahan, yes.

23      Q       That lawsuit?

24      A       Yes.

25      Q       I see Mr. Roderman I think he's one of the

1  attorneys representing --

2      A      Suzanne and Palm Steak House and Congress

3  Plaza too.

4      Q      Is he representing you in that?

5      A      No.  I'm pro se in that.  And because of the

6  automatic stay, Judge Ryskamp issued an order that I'm

7  stayed, but I want to pursue not only defending that but

8  I filed a counterclaim in that.  And I want to pursue

9  that as well.  I know you own the claim, not you but

10  the trustee.  If you guys abandon it, I want to pick it

11  up.

12      Q      Can you tell me I guess as succinctly as

13  possible --

14      A      I'll try.

15      Q      -- what is the nature of your claim and how

16  much money are you trying to recover.  That helps the

17  trustee evaluate the value of it.

18      A      I negotiated a deal with -- Ghahan had the

19  management agreement for the club.  This way none of us

20  had to worry about it.  They came in and spent some money

21  to remodel.

22              We had a lot of clauses in there that they

23  violated.  We gave them eight months to resolve the

24  problems.  When they still didn't perform or resolve

25  them, they actually took the main guy Nicky Hassan

1    (phonetic) who owns other clubs and they -- Steve Amada

2    (phonetic) bought out Nick.  That's an automatic

3    termination of the management agreement.  So we

4    terminated it.

5           We all wanted Nick involved because he knows

6    the business.  He was good at it.  He was the one that

7    made the club start making money.  Steve wanted to

8    negotiate a settlement.

9       Q    Steve who?

10      A    Steve Amada.  They owned eleven businesses

11   together, gas stations, nightclubs, you name it.  They

12   had a beef amongst themselves.  It had nothing to do with

13   us.  So Steve bought them out of everything.

14          Then he comes down to see me and he says,

15   Tommy, do you know anybody that wants to buy the

16   management agreement and my club in Toledo.  I said, you

17   want to sell the club in Toledo, I can get you a buyer

18   for that.  Because I know everybody in the business.

19   Yes.  We strike a deal.

20          We are going to buy -- I go to Joe Shammy

21   (phonetic) an accountant, which I have the thing, an

22   accountant up in Maryland who represented these guys.  I

23   got them interested in it.

24          We made a deal to buy the management contract

25   for six seventy-five and we pay them five thousand a

1   month.  When I say we, I'm talking then about me which I

2   was getting a piece of because that's what I do.  You

3   know, I don't have to -- I put people together.

4        Q    What was your -- how much --

5        A    I would have wound up with ten or fifteen

6   percent, maybe twenty at the most.

7        Q    Of six seventy-five?

8        A    Yes.  But that's not a big thing.  The club

9   in Columbus was part of the deal.  I had to go -- we

10  offered them a million and a half and Reynolds -- Mark

11  Reynolds' clients were coming up with the down payment.

12  I think it was two hundred thousand.  It was a sweet

13  deal.  It was all on paper.  You make payments.

14            So we are back and forth with Steve two or

15  three months.  He's beefing with his partners.  So we

16  have a deal, yes.  I'm going to go to New York for the

17  weekend.  Give it to your lawyers.  First I said let me

18  do the contracts.  I'll do them.  No, no, no, my lawyer

19  said he will do them.  Okay.  Have your lawyers do them.

20  They have the e-mails and everything.

21            His lawyers come back.  They send it to

22  Barry.  They sent it to Barry or David and me a copy.

23  They said that termination of management agreement

24  Suzanne is to sign, Tommy is to sign guarantying a

25  mortgage on the property.  They changed the deal

1    completely.

2              So I said, Steve, this is not the deal we

3    had.  I sent it back to their lawyers.  David and Barry

4    gave it to me.  And that was it.  Steve sells the club to

5    somebody else for two point one million.  So I -- he sued

6    us.  He is saying that I was -- you know, reneged on the

7    deal, on the six seventy-five.  And I counter sued them

8    and said that I'll still live up to that deal.  I have

9    people who will buy the management contract without a

10   problem, but the problem is now the club has been sold.

11   But we still want to live up to the deal, and you didn't

12   live up to buy the club in Columbus.

13             So that's what the lawsuit is about.  I feel

14   as though I got beat out of the commission because I

15   was -- you know, these guys were buying a club.  He sent

16   them the profit and loss statements and everything.

17   That's what my claim is.  I want to be remunerated for

18   making the deal with the club and because I went to New

19   York and three or four days later you sold it to someone

20   in Columbus.

21             And his lawyers want to settle with me.  They

22   want me to take over the note for -- two point one

23   million dollar note.  I told them up in Columbus, I said,

24   I can't get anybody to take that club over for two and a

25   half million, two point one, two million.  You make a --

1    the original deal we did was a million and a half and

2    I'll get people to buy it.  So I haven't got an answer

3    from them yet.

4         Q    The Ghahan lawsuit I thought was against Palm

5    Steak House --

6         A    It is.

7         Q    -- and you?

8         A    Yes, and Congress Plaza.

9         Q    How are they involved?

10        A    Because they are saying they own the

11   management agreement, and I was acting on behalf of Palm

12   Steak House although they have no documents that say

13   that.  But that's their lawyer's theory.  And of course

14   we have shown differently.

15             The contract itself, you know, says Palm

16   Steak House is not Farese, that I'm a consultant.  They

17   signed all of the documents.  They know.  We took the

18   deposition of the managing member.  He's already

19   testified.

20             Any time -- just as we are going through

21   right here with Mr. Goodman.  Any time there was a

22   decision to be made that needed the authority, Mr. Farese

23   went to his wife, David or Barry or we went to them

24   directly, one or the other.  The easy stuff I took care

25   of in the club.  You know, my wife is not going to come

1    in and you know.

2        Q        They are seeking that they have a right to a

3    certain management contract?

4        A        They want the six seventy-five from me for

5    the -- they want it from Palm Steak House.  They know

6    Palm Steak House doesn't have anything anymore, but

7    Suzanne guaranteed it personally.  She signed personally

8    on that.

9        Q        They are suing you and Suzanne.  Are they

10   suing for the same amount?

11       A        Yes.  They want the six seventy-five.  And I

12   say our position, my position, is the same group that was

13   going to give you the six seventy-five for the management

14   agreement wants Club Sirens so sell them Club Sirens

15   under the deal we made for a million and a half, the last

16   offer was a million five, and we can settle the whole

17   thing.

18            That doesn't give the trustee much money

19   because you have to get someone to run the club, but you

20   can turn that club over and sell it.  And they will pay

21   you directly.  That's what I want to do.

22       Q        I have seen certain papers on that lawsuit.

23   Why isn't it that Mr. Roderman or Goldstein is

24   representing you in the lawsuit as opposed to the other

25   defendants?

1    A    I got to tell you exactly the reason why you

2  see my name in almost all of these lawsuits.  As you

3  know, I have been through this once.  Lawyers cost a lot

4  of money, not that they are not entitled to it.  They

5  are.  But they are very expensive.  Unless you have the

6  money, you know, to pay a lawyer and not worry about it,

7  the guy that makes most of the money are lawyers.

8            I have trained myself to know what to do and

9  how to do it because I said to myself, Tommy, don't ever

10  get put in this position again the rest of your life.  I

11  read more law books than I don't care what you say.  Ask

12  Ken Scherer.  He knows.

13            And I said to myself any time I can be on a

14  lawsuit and represent myself, I'm going to do it.  Not

15  only now do I know the law, I also know the facts of my

16  own cases better than a lawyer.  So why have the -- why

17  have Matt sit here.  I mean in this case, I don't know

18  anything about bankruptcy law.  So I do benefit from

19  having Matt here.

20            But if it was a regular federal case or a

21  regular state case, I know as much as Matt or more, but

22  not bankruptcy law.  So I know the facts.  So I'm going

23  to do it myself.

24            Now, granted, I know some judges don't like

25  it, but they do give you the respect, most of them.

1    Okay, you are here, follow the rules like anybody else

2    otherwise I'm going to throw you out.  And that's the

3    whole reason.  So I said I'm going to be pro se because I

4    know what happened with my negotiations with Steve.

5         Q     If you can send me please at least the

6    operative pleadings which is the most recent

7    complaint --

8         A     I know what they are.

9         Q     -- most recent answer.

10        A     We just filed a second amended complaint that

11   really lays it out.

12        Q     That really what?

13        A     That really lays it out.

14        Q     Are there any summary judgment motions

15   pending?

16        A     No, but I'm going to do that next.  Even

17   though I can't -- I'm not going to file it in my own

18   name, but I'm going to do the outlines for her.

19        Q     Do you have a trial date yet?

20        A     It's -- the trial calendar comes up in

21   January of 2014, discovery ends August 15th, but we'll

22   extend the discovery because Congress Plaza was just made

23   a part of it on constructive trust.  But they don't make

24   the elements.  I'm not worried about -- we are not

25   worried about that.

1    Q    I'm trying to determine what reason is there

2  now for Palm Steak House or Congress Plaza to be

3  pursuing -- Congress Plaza appears to own some space with

4  a Chinese restaurant and some land with a million dollar

5  mortgage is my understanding.

6    A    Correct.

7    Q    Does Palm Steak House own anything anymore?

8    A    No, because Suzanne -- that's why they made

9  Suzanne because she -- they know that she owns --

10  whatever there is, she's owned for twenty years all of

11  our stuff.  So that's why they made her because she

12  guaranteed the management agreement.

13        That's another reason why they are going to

14  lose.  We also said to them when Steve bought out Nick, I

15  said, Steve, you have got to sign personally the

16  management agreement.  I'm not signing personally.

17  Because he's worth a lot of money.  He's worth a few

18  million.  You have to sign it.  Suzanne signed it.  I

19  said let my wife off.  Oh, no.  Oh, no.

20        You are going to lose the agreement

21  altogether.  David and Barry aren't going to go for this.

22  If you sign and come to the table, maybe we can resolve

23  it that way but you have to sign personally.  Nicky

24  signed.  He's worth just as much money as the other guy.

25  But, you know, he did the right thing the whole time they

1    had the agreement.

2        Q      Have there been any mediations?

3        A      Not yet, but we will.  The last thing I got

4    from Robon (phonetic) his lawyer in Toledo is he sent me

5    the note.  It's two point one million.  Do you want to

6    take it over.

7               I said I'll never be able to get anybody to

8    sign this for two point one million.  The club is worth a

9    million and a half and not another nickel.

10              The reason it's -- I'm teaching you a little

11   business now.  The reason is because the rent is only

12   seventy-five hundred, ten thousand, because Steve owns

13   the property as well.  So he has cheap rent.  That rent

14   should be eighteen or twenty like ours was.  So that's

15   what that case is about.

16       Q      They want to sign a two point one million

17   dollar, I'm sorry, what is --

18       A      Note.  He sold it to somebody else.  They are

19   not paying.  I told him that you are going to sell it to

20   this guy, and this guy won't give you a nickel.  This guy

21   is not going to pay you.  He's going to rob the joint.

22   Excuse me for talking this way.  But that's how you do

23   business.  He's going to rob the place.  He's not going

24   to pay you, and you are turning this whole joint over to

25   him.

1          And, sure enough, four months later they made

2    two payments.  In the last eight months, they have not

3    made one payment.

4          Q     Are they doing anything with --

5          A     Sure, they are doing it.  They ran the

6    business into the ground.  They were doing thirty,

7    thirty-five thousand a week.  Now they are probably doing

8    about eighteen or twenty.

9          But that can be cleaned up in two or three

10   months if I put the right guy in there.  You know, you

11   hire the right guy.

12         These guys that were interested they own

13   seven joints in Jersey.  They will throw a manager over

14   there and clean it right up.

15         That's why I say the income source is there,

16   you know what I mean.  I figure if I can do that and I

17   can wind up with ten percent of it, that's great.

18         Q     Let me determine --

19         A     Do you want me to tell you about his?  I

20   don't know what you guys think about his.  His is

21   quicker.

22         Q     When you say his, what are you talking

23   about?

24         A     Mr. Goodman.

25         Q     They have a judgment.

1      A      They have a judgment because I wasn't there

2   at the summary judgment.

3      Q      It's not on appeal, is it?

4      A      No.  I was getting ready to file the 1.540

5   motion, right, and then he was pushing so much, so quick,

6   I couldn't wake up in the morning.  What are you doing.

7   Come on.  I had the hospitals calling me because I owe

8   them forty thousand.  I said come on, this is too much.

9   So I filed bankruptcy.

10           But I really wanted to -- as a matter of

11  fact, I told David, Mr. Merrill, I want to do a motion

12  for relief over here because I feel as though, first of

13  all, Darlene was already paid.  They say it's a different

14  item.

15           Louie Ioni who also guaranteed the loan --

16  they did give us the loan.  They gave it to RAK Ceramics,

17  but we guaranteed it.  Louie gave her his condominium on

18  Flagler Avenue already.

19           MR. GOODMAN:  A year before the loan was even

20      made.

21           THE WITNESS:  That's right, but there are

22      claims on that.  A year before the loan, that's

23      right.  But it's very clear Louie testified that it

24      was for all of their business dealings because they

25      had a lot of business dealings together.  I mean

1    all clean legitimate stuff.  But they had a lot of

2    things going together.

3         So she had a claim on his apartment for five

4    hundred thousand.  That was to guaranty all this.

5    So when Louie and I guaranteed the Mike Carey loan

6    that she gave -- Michael, I forget how much it was.

7    I mean three hundred.  I forget what it was.  They

8    made a couple hundred thousand on that.  I didn't

9    get any money from it.  Okay.

10        You want to sue me for this after you have

11   Louie's apartment already.  And my wife wanted to

12   give them seventy thousand just to stop her

13   headache.  Suzanne said, Tommy, let's pay it.

14   Suzanne, I'm not going to -- I can't tell you to

15   pay it.  Let's stop it all.  I'll pay her the

16   money, the seventy.

17        So I told Mr. Goodman.  They don't want to

18   take it.  So all you can do is go back to

19   Suzanne, but she won't give another nickel.

20        But that's -- so I want to go back to the

21   state court and try to get -- on a 1.540 motion get

22   it vacated because we weren't there.  He gave them

23   a summary judgment against -- I gave him an

24   affidavit, me and Louie both.  He said, I'm not

25   taking the affidavit because it was only sworn to

1          under penalty of perjury.  You know what a 1746

2          affidavit is.

3    BY MR. BAKST:

4          Q     Why didn't you file an appeal?

5          A     Listen, I was locked up the whole year of

6    2012 on that case.  I came home.  I did kidney surgery.

7    Back in again, more kidney surgery.  They couldn't

8    get the stones out.  They had to cut me open and forget

9    it.  Then I had a heart problem, my heart got weak, and I

10   was with the doctor for that.

11            Meantime he throws it out for summary

12   judgment.  I don't know it.  I come back from New York

13   from the trial in December.  I think I got found not

14   guilty December 1st and 2nd.  And I open the mail, I have

15   a stack of mail like this (indicating), and there is the

16   thing, summary judgment.  Summary judgment, is he kidding

17   or what.

18         Q     The judgment is sometime in 2012, isn't

19   it?

20         A     2013 was the hearing.

21            MR. GOODMAN:  January.

22   BY MR. BAKST:

23         Q     There is a judgment from January?

24         A     It's a judgment from January.  So I filed a

25   motion.  First I filed an objection because I don't have

1    a head for this, I wasn't physically well for it.  I

2    filed an objection.  We filed everything I could file

3    that Saturday because I was just -- because the hearing

4    was either Monday or Tuesday.  I forget.  But it was

5    within a couple of days.

6              He got Judge Kastrenakes.  Apparently, I'm

7    not sure yet, but he had the division.  Kastrenakes I'm

8    sure he's a sweet guy, but he was the head of the

9    organized crime department of Fort Lauderdale for the

10   United States.  He knows my name.  Farese, oh, forget

11   about it.  What do you want, a summary judgment.  Give me

12   the thing.  I'll sign anything you want.  Case closed.

13   Done.  I said, oh, my God, what happened here.

14             I wasn't there.  I didn't show up in court.

15   And Louie was in New York on the death bed with his

16   sister, you know, and we told Mr. Goodman that.

17   Mr. Goodman, come on.  I just got out of a heart

18   problem.  Do you want to call my doctor.  Do you want

19   to check the hospitals.  No, that's the date.  I'm going

20   forward.

21             I said not only that, then I find out about

22   Kastrenakes.  I said, how could you do this.  On the

23   last day he had that division, is when he signed the

24   thing.

25        Q    That's in January.  You filed bankruptcy in

1    May.  Did you file anything after the judgment?

2         A    I filed, yeah, sure.  I filed motions to stay

3    the judgment.  I filed the list of 540, all of my issues

4    that I wanted to take on 540, 1.540.  You know, I gave

5    them all of the law and everything.

6              Somehow Judge Kastrenakes, because he was

7    getting his things twisted, somehow Kastrenakes issues an

8    order.  It wasn't his division.  He's in criminal

9    division.  Judge -- who was the judge -- Gillen had it?

10   Who had it at that time?

11             MR. GOODMAN:  Gillen.

12             THE WITNESS:  Gillen.  As a matter of fact,

13        we had one hearing before Judge Gillen.  He wanted

14        Suzanne's information.  So I felt he didn't go

15        about it the right way.  So we had a hearing before

16        Judge Gillen.

17             And I said, Judge, here is the law.  He has

18        to do A, B, C before he can start demanding stuff

19        about Suzanne.  So he read it.  And he says, I

20        think he's right so we are going to give Farese a

21        hearing on whether or not, you know, he's got to

22        tell you about his wife.

23   BY MR. BAKST:

24        Q    This is all post judgment collection

25   effort?

1    A    Yes.

2    Q    You are talking about a 1.540 motion.

3    A    I never filed the actual motion.  I filed an

4  order to vacate -- to stay the judgment so that I could

5  file the 1.540 and to give it some substance I listed all

6  of my issues.

7    Q    Was that motion ruled on?

8    A    This is the thing.  Instead of it going to

9  Gillen to get ruled on, we had hearings before Gillen,

10  out of the clear blue sky I checked the docket sheet one

11  day and Kastrenakes denied this.  How the hell did he get

12  this case.

13       Right away I said, I'm going to Palm Beach.

14  I get dressed.  I went up to Palm Beach.  I asked the

15  clerk, what division does Kastrenakes have.  Oh, he's in

16  the criminal division, Mr. Farese.  How did he get this

17  case?  He said, well, let me see.  I'm staying away from

18  that one, Mr. Farese.  I don't know.  I'm staying away

19  from that one.  Give me an answer.  I don't know.  I

20  can't give you an answer.  I don't know anything about

21  it.  Well, who does?  I don't know.

22       So somehow he got that motion when it was

23  assigned to Division AJ, is it, Gillen had it.  I'm not

24  blaming him.  I'm saying it looks funny.

25    Q    You started talking about this because you

1    are telling me you want your bankruptcy attorneys to file

2    something so you can pursue a motion?

3         A    Right.  I want you not to object to the

4    motion to -- relief from judgment so I can pursue the

5    state case.

6         Q    I don't know that there would be -- I'm not

7    sure there really would be a stay as to your filing that

8    type of a motion that's a defensive motion.

9              MR. GOODMAN:  I think there would be,

10             Michael, because then I should be entitled

11             to collect which obviously I would be going

12             after assets of the estate which I know I can't

13             do.

14             MR. BAKST:  Certainly whatever is property of

15             the estate is property of the estate.  I have had

16             cases before where there is a judgment against

17             someone, and they want to challenge it.  It's

18             usually an objection to claim, and the first

19             response from the bankruptcy judge is they are

20             going to recognize there is a judgment.  If they

21             thought there was a basis to challenge it, that's a

22             claim between him and your client.  I don't know.

23             If there is a stay, we will certainly look at the

24             case law, look at the motion if they file

25             something.

1        MR. GOODMAN:  I would have to look at the

2    case law and motion as well, but I think the entire

3    case would be stayed.  I think it's fundamental

4    fairness that he shouldn't be entitled to proceed

5    in state court and we are not entitled to

6    proceed.

7        MR. BAKST:  I think at some point maybe his

8    attorneys will file something, and Judge Kimball

9    will determine to what extent he can prosecute

10   that.  The only reason I say any of this is because

11   I don't want to give anybody an argument to make in

12   the state court that the reason I couldn't show due

13   diligence seeking to set aside the default judgment

14   was because I was under the impression I couldn't

15   do anything because of the bankruptcy.  If he

16   thinks he has that right or if he wants to assert

17   that right, he needs to do something.

18       MR. GOODMAN:  He didn't file anything for

19   months before he filed for bankruptcy, and he filed

20   bankruptcy the day before we had a hearing in front

21   of Judge Gillen to implead Suzanne Farese as a

22   third party defendant under the motion for

23   proceeding supplementary and to also compel the

24   depositions of Roderman and Goldstein.

25       MR. BAKST:  Those are all valid arguments.

1          At some point, it will be in front of some judge,

2     not me.  I don't make that call.

3          MR. GIRARDI:  I think the state court

4     judges are reluctant to go forward on anything with

5     those type of matters when there is stay in place,

6     but we'll discuss it.

7          THE WITNESS:  Is there a mechanism in

8     bankruptcy court for me to challenge the

9     judgment?

10          MR. GIRARDI:  I'll discuss that with you.

11          THE WITNESS:  I know I can file a

12     counterclaim to his adversary.

13          MR. GIRARDI:  I'll discuss your rights.

14          THE WITNESS:  You charge six hundred dollars

15     an hour.

16          MR. BAKST:  I can tell you even filing a

17     counterclaim depends on what your counterclaim

18     would be for in the adversary.  If it's a cause of

19     action that would be property of the bankruptcy

20     estate, it would be a position that's a cause of

21     action of the estate.  I don't know whatever

22     counterclaim you would bring.

23          THE WITNESS:  I wouldn't mind that as long as

24     I get a fair chance to challenge what happened.  I

25     wouldn't mind if you guys got the money if there

1    was any money coming.

2         MR. BAKST:  I don't know what your

3    counterclaim could be or would be.  My inclination

4    is to think that whatever the claims are probably

5    should have been raised in the state court

6    litigation.

7         THE WITNESS:  I did raise it in the state

8    court litigation, and I wasn't there to be heard.

9    And the judge wouldn't hear us because he said

10   my -- he wouldn't take my affidavit because I swore

11   to it under penalty of perjury instead of having it

12   notarized with a stamp.  And you know in federal

13   court that 1746 as long as you swear under penalty

14   of perjury, it's the same thing.

15        MR. GOODMAN:  The summary judgment states

16   exactly what happened.

17        THE WITNESS:  You wrote the summary judgment.

18   You wrote that summary judgment.

19        MR. GOODMAN:  The summary judgment states

20   exactly what happened.

21        THE WITNESS:  We're getting off.  I'm sorry.

22   BY MR. BAKST:

23        Q    Let me determine today at least what other

24   documents do you have?  There are several other items in

25   here.  It doesn't look like you have much left in front

1    of you.  It might be easier to tell me what you still

2    have left.

3         A    There is -- this is the -- where I filed the

4    administrative appeal with the -- that he said I filed

5    it because I called myself an owner or something in

6    here.

7         Q    You are showing me -- I think I have seen a

8    copy of this notice of administrative appeal.

9         A    I want to explain what this is about.

10        Q    This was pending in as far as Palm Beach

11   County where your title is Thomas Farese, an individual

12   as person in charge of the property, transferee and

13   equitable and beneficial owner of property, purchaser,

14   successor in interest and assignee.  Okay.  You wanted to

15   explain that?

16        A    Yes.

17        Q    I'll give these back to you.  It's copies of

18   what is in this binder that I was provided.

19        A    This caption -- do we call this a caption or

20   style?

21        Q    Style.

22        A    This style is taken exactly from the statute

23   book that gives you the right to appeal an

24   administrative.  Because it was so up in the air about

25   how am I going to do this and get standing, let's just

1    take the statute and cite the statute and then if anybody

2    says you don't have standing, Farese, which they do all

3    of time to me, I'm going to say I am the person in

4    charge so I have standing under that section with no

5    problem.  I don't have to have standing under all of them

6    as long as I have standing under one of them.

7              But just while we are talking about the law,

8    I'm also a beneficial owner which is why you saw me sign

9    some of those other things.  Because from the day that

10   Dude signed the settlement agreement with me and

11   everything, once I exercised my option to buy the

12   property, I am the beneficial owner.  Okay.

13             So I was using that, and I'm going to give

14   you some case law on it.  I don't have the cases, but

15   it's real.  Just so you will have it so you will know

16   that there is such a thing.  Kosakas versus Kosakas

17   (phonetic), Harris versus Waldrich (phonetic).  They all

18   say that -- Garnier versus Lapoff (phonetic), said it

19   reversed -- it's clear to us that until an optionee

20   exercises his right to purchase in accordance with the

21   terms of his option, he has no estate.  The key word is

22   here until he exercises his option.

23             That's what all of these settlements, you

24   will see in every preamble, that I was exercising my

25   option.  When I did it, I became the beneficial owner.

1        Q       Do you want to give this to me?

2        A       No.  I just wanted the record to be aware.

3    That's why I put this down.  I'm trying to get standing

4    so I don't have to hire a lawyer and give him five

5    hundred an hour to do an administrative appeal from a

6    zoning violation.

7        Q       What was the date of that?

8        A       May 10.  I was the person in charge of the

9    property is what I really was, but he was trying to make

10   such a big thing out of this beneficial owner thing.

11       Q       What was the date of that?

12       A       May 10, 2010.

13       Q       So as of May 10 of 2010, you believe that you

14   were the beneficial owner of what; those various

15   entities?

16       A       I believe I was the beneficial owner.  I know

17   what you are going to say.  You are going to say you were

18   the real owner.  I wasn't the real owner.  Being the

19   beneficial owner is not the same as an owner.  That only

20   means that I exercised some right or option that I have

21   to the property in this case because the law breaks them

22   all down, are you a beneficial owner, an equitable owner,

23   what kind of owner are you.

24       Q       What was your right in that case?

25       A       I was the person in charge of the property,

1    the very first one.

2         Q     It also says beneficial owner?

3         A     Yes, but that's not what I was going by.  I'm

4    just showing you what the law is because he made such a

5    big deal out of it.  I was the person in charge of the

6    property since it was taken over.  Okay.

7              Now when I became the mortgage holder -- not

8    the mortgage.  When I guaranteed the -- when I guaranteed

9    the -- what was it?

10        Q     Note?

11        A     The note.  When I guaranteed the two point

12   three million dollar note, I had an interest.  You could

13   say that I had an interest enough that -- and I was in

14   charge of the property anyway.  So that's why I was

15   appealing it this way.

16        Q     What happened with that appeal?

17        A     It was dismissed.  We straightened out all of

18   the violations, and we went back to the -- it's one of

19   the things that Ghahan did that they shouldn't have done.

20   They did a lot of things without permits.

21             For me being there every day, I was in there

22   and we straightened out the permits.  We got as builts.

23   Whatever they asked me to do, I did.

24        Q     Any other documents you have with you

25   today?

1      A      The foreclosure.  You already -- the

2    foreclosure I already explained to you.  You got this

3    from yesterday.  I wanted to give you this.  This has the

4    George stuff in it in case you want to see that.  There

5    is the second mortgage with George.  This was given to

6    Congress Shopping Center and Congress Management.  This

7    is the one we bought from Dude.  I don't know if you have

8    that or not.

9      Q      Okay.

10     A      Here is the final order of dismissal of that.

11   This is July 9, 2010 by judge -- and I just want to show

12   you paragraph three.  The judge ordered all this

13   confidential.  That's why I'm asking you for the

14   confidentiality because we have to get in touch with

15   every one of these people to release this stuff.

16             MR. GOODMAN:  That looks like a motion to

17        dismiss, and I don't think we need that.  I don't

18        know if there is anything attached.

19             THE WITNESS:  Here are the dismissal order.

20             MR. BAKST:  I'll give that back to you.

21   BY MR. BAKST:

22     Q      You are showing me a dismissal order I think

23   you called it.  Joint motion for dismissal filed July of

24   2010.  Okay.  There is an order of dismissal.  You think

25   this is something that was confidential?

1      A      It has the Jeff George thing in there,

2  doesn't  it?

3            MR. GOODMAN:  Is that what directly led to

4        the July 21, 2010 deed into Congress Plaza, LLC?

5            THE WITNESS:  No.  Here is the reason I

6        wanted you to have this.  He showed you this

7        yesterday.

8            MR. BAKST:  I'll make this 16 because we are

9        not sure if it's something we have or not, relates

10       to the dismissal of Jeff George.

11            (Whereupon, Trustee's Exhibit Number 16 was

12       marked for identification.)

13            THE WITNESS:  This is the motion to dismiss

14       filed by Congress Shopping Center.

15  BY MR. BAKST:

16      Q      You can hold on to that.  Any other documents

17  you brought today?

18      A      No.

19      Q      We have gone through the various documents

20  that I think you are going to try to obtain.  There is a

21  question of whether we have the actual contract, the

22  purchase and sale contract, from 2012 resulting in either

23  four and a half or five million dollars.

24      A      I didn't give you that?  You are talking

25  about the stipulation I gave you?

1    Q    No.  That was from 2010.  We are talking

2    about in 2012.

3    A    The one we put the lease in with Jennifer

4    Labbe?

5    Q    No.  We have the bill of sale from October

6    2012 from yesterday.  It was Exhibit 19.  And that

7    referenced that there is a certain agreement of sale and

8    purchase dated September 17, 2012 so there is some

9    contract.

10    A    You mean when they sold it to Lizza, the

11    guys that have it now?  Is that what you are talking

12    about?

13    Q    Yes, sir.

14         MR. GOODMAN:  Should be two contracts, one

15         for the real estate and one for --

16         THE WITNESS:  I have to get their permission.

17         I can't give you that without their permission, but

18         I'll ask them.

19         MR. BAKST:  Okay.

20         THE WITNESS:  Here is a --

21         MR. BAKST:  You have seen -- well, I don't

22         know if you saw this from yesterday.  It was

23         marked.  We will make this 17.

24         (Whereupon, Trustee's Exhibit Number 17 was

25         marked for identification.)

1   BY MR. BAKST:

2       Q    Do you recognize this, Mr. Farese?  This is

3   the bill of sale.

4       A    Yes.

5       Q    Why are you a signatory to that as opposed to

6   Congress Plaza or Suzanne or --

7       A    Because, and you will have to ask Mr. Tasini

8   to verify this, Tasini wanted me as the original owner of

9   the stuff when I won the judgment to sign this to make

10   sure there was nothing left over inside the club that I

11   could come back and say, oh, this was mine from 2006 or

12   this was mine from whenever.  So I said, okay, I'll sign

13   it.

14          And that's -- I mean I asked him, Oren, I

15   don't own anything.  Well, then you won't mind signing

16   the bill of sale that anything that is in there because

17   he has it in here, all removable improvements, you

18   know, because of the word chattels that I had to sign

19   I think.

20       Q    Do you see in paragraph B, can you just tell

21   me -- I probably know what you are going to tell me.  Do

22   you know who are the parties to the agreement referenced

23   on the first page in paragraph B?

24       A    Seller and buyer?

25       Q    Yes.  Is it the same parties to this same

1    agreement?

2        A    I'm not the seller.  I signed this for the --

3    as it says in here, the removable infrastructural

4    improvements located on or at the property.  So that's

5    what I thought I was signing.  And if you ask -- why do

6    they have Palm Steak House sign it as the seller?

7    Because Palm Steak House I gave it all to Palm Steak

8    House.  They wanted both of us to sign.

9        Q    Palm Steak House had the right to operate the

10   business; right?

11       A    No.  I assigned everything to them.

12       Q    Right, which is what they had --

13       A    Everything.  Not only the right to operate.

14   They owned everything.  It's in the lease.  Remember I

15   showed you the lease.

16       Q    Right, Exhibit 6.

17       A    I assigned everything to Palm Steak House --

18   to Palm Beach Gentlemen's Club which became Palm Steak

19   House.  So he wanted me to sign because I was the guy --

20   I'm not sure if he had the thirty-year lease before me.

21   He might have been going by the sixty-year lease.  You

22   heard Barry say yesterday Oren prepared all of the

23   documents.

24            And I did sign this, but that's the reason I

25   signed it.  If you think I'm the seller by myself, why

1    does it have Palm Steak House on there.  He wanted to

2    make sure like any good lawyer will do, hey, listen, we

3    want all of you to sign.  However you were involved, we

4    don't care.  If you all don't sign, we are not buying.

5                I would have done the same thing.  I would

6    have everybody.  I did it with Harald.  I made Denise

7    sign.  I made him go to Germany and get his brother to

8    sign.  I made them all sign.

9                Now you are coaching the witness,

10   Mr. Goodman.

11        Q     Actually, I'm the attorney.

12        A     You are going to file your adversary

13   complaint.  You are going to get your shot at me.

14                MR. BAKST:  At this point in time, it's after

15            5:00, there are certain documents that you are

16            going to provide.

17                THE WITNESS:  When do you want me back?

18                MR. BAKST:  As soon as you can provide the

19            documents.  There is going to be a hearing next

20            week.  Let's see what happens next week as to

21            whether there is going to be a deposition anyway so

22            we can coordinate ours at the same time.  Otherwise

23            send me the documents as soon as you can.

24            Certainly send it through your attorneys.

25                I think generally I think I have made clear

1    as far as primarily what we are looking for.  I'll

2    go through the schedules with you next time.  I

3    would encourage you to read through the schedules

4    that you filed, read through your amendments.  If

5    there are any other changes that you want to file,

6    do it.  File it now.  Don't wait.  It has a big

7    impact on whether or not you get a discharge on

8    whether you timely make amendments.

9         So I'm explaining that to you so you have

10   this chance to try and clean everything up if there

11   is anything you think needs to be cleaned up.

12   Okay.

13        Otherwise there is a hearing next week, and

14   we are not concluding.  We will reconvene when we

15   have more of the documents and we also know if

16   there are going to be other parties taking your

17   deposition.

18        Do you wish to read or waive?

19        THE WITNESS:  I will read of course.

20        MR. BAKST:  I know there is an issue about

21   what happens with these documents until the hearing

22   next week.  I'll leave everything with the court

23   reporter.  Before giving a copy of at least the

24   documents, we will get a court order on that

25   because there is an issue raised.  Are we clear on

1          that so far?

2                    MR. GIRARDI:   I think that's exactly it.

3                    (Whereupon, the proceedings were adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   ERRATA SHEET

2   PAGE      LINE        CHANGE         REASON

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       I, THOMAS R. FARESE, do hereby certify that the

2   foregoing transcript, with Errata Sheet attached, is true

3   and correct to the best of my knowledge and belief.

4       Dated this _____ day of _____, 2012.

5

6

7                   _____

8                   THOMAS R. FARESE

9

10

11      Sworn to and subscribed before me this _____ day of

12   _____, 2012.

13

14

15                  _____

16                  NOTARY PUBLIC

17                  STATE OF FLORIDA AT LARGE

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OATH

2     STATE OF FLORIDA

3     COUNTY OF PALM BEACH

4              I, the undersigned authority, certify that

5     THOMAS R. FARESE personally appeared before me and was

6     duly sworn.

7              WITNESS my hand and official seal the

8     _____ day of _____, 2013.

9

10                        _____

11                        JANICE L. MAMINO

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATE

2    STATE OF FLORIDA

3    COUNTY OF PALM BEACH

4          I, Janice L. Mamino, certify that I was authorized

5    to and did stenographically report the deposition of

6    THOMAS R. FARESE; that a review of the transcript was

7    requested; and that the transcript is a true and complete

8    record of my stenographic notes.

9          I further certify that I am not a relative,

10   employee, attorney, or counsel of any of the parties, nor

11   am I a relative or employee of any of the parties'

12   attorney or counsel connected with the action, nor am I

13   financially interested in the action.

14         Dated this _____ day of _____,

15   2013.

16

17

18                     _____

19                        JANICE L. MAMINO

20

21

22

23

24

25
```